**UNITED STATES DISTRICT COURT**
**For the**
**EASTERN DISTRICT OF NEW YORK**

_____x

GUS HALOUVAS,

                   Plaintiff,                    **COMPLAINT**

            -against-                      **1:18-cv-1712**

RYAN ZINKE, Secretary, U.S. Dept. of
      the Interior

               Defendant                **Jury Trial Demanded**

_____x

Plaintiff, GUS HALOUVAS, by and through his attorney, FELICIA NESTOR, ESQ.,

complains of the Defendant as follows:

## NATURE OF ACTION

1.     Plaintiff brings this action for declaratory relief, injunctive relief, back pay,

front pay, compensatory damages, attorney's fees, costs and other relief to redress the

injuries he suffered as a result of being discriminated against and harassed, on the basis of

age (over 40), disability (physical), and race (Caucasian), and of being retaliated against by

his employer.  This action is brought pursuant to Title VII of the Civil Rights Act, as

amended, 42 U.S.C. § 2000e *et. seq.*, the Rehabilitation Act of 1973, as amended, 29 U.S.C. §

701 *et. seq.,* the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§

621-634a and the Civil Rights Act of 1991 42 U.S.C. 1981a.

2.  This complaint seeks relief for harms caused to Plaintiff by Defendant and his

agents, who were managers within Defendant's agency, the National Park Service ("NPS" or

"Agency"), when they subjected Plaintiff to a hostile work environment, which they failed to remedy, resulting in Plaintiff's permanent physical disabilities after being assaulted by another employee on the job; retaliatory harassment; deprivation of remuneration and benefits to which Plaintiff was entitled by virtue of his employment, constructive demotion and ultimately, constructive termination of employment with the Agency, when Plaintiff transferred to another federal agency by taking a job at a lower pay grade.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331, Title VII 42 U.S.C. § 2000e-16, Title VII 42 U.S.C. § 2000e-5(f), Rehabilitation Act of 1973 29 U.S.C. §§ 701-796 (2012), and the Age Discrimination in Employment Act ("ADEA") 29 U.S.C. §§ 621-634 and 42 U.S.C. § 1981a.

4.      Venue is proper under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §1391 because a substantial portion of the acts and omissions giving rise to the complaints herein occurred within this judicial district.

## ADMINSTRATIVE PREREQUISITES

5.      Plaintiff complied with the requirements of Title VII, the Rehabilitation Act and the ADEA by timely contacting the applicable civil rights office for Defendant's Department in September 2014.  Plaintiff later timely filed a formal complaint in January 2015.[1]

6.       Defendant's Department conducted and completed an investigation and Plaintiff timely filed a request for a hearing before an Administrative Judge ("AJ") with the Equal Employment Opportunity Commission ("EEOC").

---

[1] Plaintiff's complaint filed with the Agency was assigned number NPS-14-0511.

7.     Plaintiff's case was accepted by an AJ in April 2016. [2]

8.     In May 2016 and on February 3, 2017 Plaintiff timely filed motions requesting that the AJ accept four additional claims for hearing.  On April 10, 2017 the AJ accepted all of Plaintiff's additional claims except for one claim, which is currently still pending a decision by the AJ with jurisdiction of this case.

9.     It has been more than 180 days since Plaintiff has timely filed a complaint on any claim alleged herein, no appeals have been taken and the Department has taken no valid final action.[3]  Therefore, Plaintiff has satisfied the administrative prerequisites to bring this suit. 29 C.F.R. § 1614.407(b).

### PARTIES

10.     Plaintiff Gus Halouvas (hereinafter "Halouvas" or "Plaintiff") is a Caucasian male with a disability over the age of 40.  Halouvas was employed by Defendant Ryan Zinke between November 2006 and June 2015 when, as a GS-13 level employee, he was constructively terminated.  Halouvas is a resident of Nassau County in the State of New York.

11.     Defendant Ryan Zinke is Secretary of the Interior and head of the United States Department of the Interior ("Department"). Secretary Zinke is sued in his official capacity only.  Secretary Zinke's address is 1849 C. Street, N.W., Washington DC 20240. The

---

[2] Plaintiff's case filed with the EEOC was assigned EEOC No. 530-2016-00098X.

[3]  Plaintiff timely filed motions to amend his complaint, in May 2016 and on February 3, 2017, with the Administrative Judge (AJ) who had jurisdiction over this case. Plaintiff later contacted the Defendant's EEO office about the same new claims and defendant began processing the new claims. On April 17, 2017, the Administrative Judge accepted three of Plaintiff's four amendments, and currently holds the fourth claim in abeyance.  Plaintiff did not respond to the Agency's Notice of Right to File at the close of the Agency's investigation because all claims had already been made a part of the hearing before the AJ. Defendant's Final Agency Decision, which was mailed to Plaintiff on December 15, 2017, was therefore moot when it was issued.

acts and omissions underlying this complaint were taken by managers in Defendant Zinke's National Park Service ("NPS" or "Agency").

12.    Defendant's NPS has a local unit called the Gateway National Recreation Area ("Gateway").  Gateway is comprised of three units (parks), which are located in Jamaica Bay, New York; Staten Island, New York; and Sandy Hook, NJ. A substantial portion of the acts and omissions relevant to this complaint occurred within Gateway.

## MATERIAL FACTS

13.    Halouvas began working for Defendant in Gateway in November 2006 as a WS-11 employee.  He was promoted to a GS-12 in 2013.

14.    By virtue of Halouvas' race, age, disability status and prior protected activity, Halouvas is a member of several protected classes, under the applicable statutes.

15.    Halouvas' race and over-40 year old age are apparent and, were known to Defendant's managers who met Halouvas personnally, and in other ways as specified herein.

*Halouvas's Disability*

16.     In mid-October 2010, Halouvas survived an airplane crash and sustained injuries to his spine and left leg. The crash was not work-related. As a result of his injuries, Halouvas underwent several surgeries and was hospitalized or in a rehabilitation facility for approximately 2 months.

17.    Thereafter, Halouvas was disabled.  Because of the physical injuries to his spine and leg, he was substantially limited in the major life activities of walking and standing as detailed below. Additionally, the injuries caused chronic pain, which substantially limited him in the major life activities of thinking, concentrating and working.  Halouvas began taking pain

medication to ameliorate the pain; however, the side effects of the medication also, but to a lesser degree, substantially limit him in the major life activities of thinking, concentrating and working.

18.     After the plane crash, Agency managers became aware of Halouvas's disabilities. Halouvas discussed the plane crash, his injuries, his recovery and his remaining disabilities with numerous Agency managers, some of whom are named in this complaint as responsible for discriminating against Halouvas.

19.     As Halouvas was recovering in November 2010, he was unable to stand or walk and it was unclear whether he would ever be able to stand or walk again, with our without reasonable accommodation.  Halouvas discussed his likely need for reasonable accommodation with his then-supervisor, Richard O'Neill ("O'Neill"), when O'Neill and Brian Collier came to see Halouvas in the rehabilitation center for that purpose.

20.     In December 2010, Halouvas attended Gateway's annual meeting and party while still confined to a wheelchair, where Gateway's Deputy Superintendent ("Dep. Supt.") Susan McCarthy gave Halouvas his five-year longevity award.

21.     Halouvas returned to work in the Jamaica Bay park in March 2011, while still wheelchair bound.  Mr. O'Neill assured Halouvas that he would not be expected to perform physical tasks since he was in a supervisory role.

22.     As Halouvas recovered and began using a walker, then a cane, he was given a government vehicle for his exclusive use because of his disabilities.

23.     In the fall of 2011, Halouvas informed Dep. Supt. McCarthy ("McCarthy") that he was taking several different prescription medications for his injuries and resulting pain. Halouvas informed McCarthy that the side effects of this treatment were anxiety, depressin, insomnia and yawning.

24.     In December 2011, Halouvas attended the Agency's annual meeting and party while he was still using a cane. There, he had a discussion about his recovery with Douglas McLeod ("McLeod"), the Administrative Officer ("AO") of the Staten Island park, including a detailed discussion about the accident, the initial uncertainty that Halouvas would ever walk again, and Halouvas's progress since then.

25.     In the summer of 2012, Halouvas attended an IT course for Gateway managers. There, Halouvas again discussed his accident, his injuries, and his recovery with McCarthy and McLeod.

26.     Except for a short period between July 2013 and January 2014, discussed below, Defendant provided Halouvas with a vehicle for his exclusive use.

27.     Halouvas continues to be disabled. He is substantially limited in walking, working, and standing for prolonged periods of time because his injuries substantially interfere with the functioning of Halouvas's muskuloskelatal system.  He can walk for a limited amount of time but if he walks further, he starts to limp severely.  If Halouvas stands for longer than ten to 15 minutes, his left leg begins to go numb. Halouvas continues to take medication on a daily basis to reduce the pain caused by his physical injuries, which could be intolerable without the medication. However, the medication routinely interferes with the functioning of his nervous system and his gastrointestinal systems.  The medications routinely causes anxiety, discouragement, feelings of sadness and emptiness, and can make can make him irritable and nervous.  Occasionally, Halouvas suffers a flare up of the pain, which is not sufficiently controlled by his medications, that nearly incapacitates him, substantially limiting him in the aforementioned major life activities, as well as sleeping, eating, communicating and others.

28.     Halouvas kept Agency managers apprised of the substantial limitations imposed on

Halouvas's functioning by his permanent physical injuries and the medication he took regularly to control the associate pain.

*Halouvas was qualified for his position*

29.    Between November 2006 and July 2013, Plaintiff served as a WS-11 Buildings & Unility Foreman, ("B & U Foreman") a supervisory position, in Gateway's Jamaica Bay park.

30.    In 2009, Halouvas was named 2009 National Parks of New York Maintenance Supervisor of the Year in recognition of his performance, achievements and contributions to the National Parks of New York Harbor.

31.    Throughout Halouvas's employment in Gateway, until he complained of discrimination in August 2014, Halouvas's supervisors gave him "Superior" ratings on all performance appraisals.

32.    Based on these Superior ratings, Defendant gave Halouvas concomitant cash awards each year before he objected to and complained of discrimination.

*Halouvas's appointment to the position, and performance as Facility Manager[4] in the Agency's Staten Island park*

33.    In late 2012, Superstorm Sandy caused considerable damage in the Agency's Gateway parks.

34.    As a WS-11 B & U Foreman in the Jamaica Bay park, Halouvas worked closely during the recovery efforts with Alan Mayton ("Mayton"), the Asset Program Manager and Chief of Maintenance for Gateway. Mayton supervised the GS-13 Facility Managers in all three Gateway parks.

---

[4] The Facility Manager is also known as the Supervisory Facility Operations Specialist or the Chief of Maintenance at the individual Gateway park.

35.     The GS-13 Facility Manager ("Fac. Mgr.") position was a higher graded position with a higher salary than Halouvas's position as the WS-11 B & U Foreman.

36.     As a result of working closely with Halouvas, Mayton expressed appreciation for Halouvas's abilities and management style.

37 .     In July 2013, when a temporary, 120-day detail of the Fac. Mgr. position opened up in the Staten Island park ("SI"), Mayton encouraged Halouvas to apply for this detail, which would be an intermediary GS-12 position.

38.     The Gateway SI park has three subsections along the eastern coast of Staten Island: Great Kills, Miller Field and Fort Wadsworth. These subsections are approximately 5 miles away from each other, with Miller Field in the middle of the other two.

39.     At that time, Dept. Sup. McCarthy was the first line supervisor for both Mayton and AO McLeod. McCarthy, Mayton and McLeod all worked in Building 210 in the Fort Wadsworth area of the SI park.

40.     McLeod knew that Halouvas was interested in, and was being considered by Mayton for the Fac. Mgr. detail, but McLeod recommended that Mayton appoint a former subordinate of McLeod to the position - William T. White III.

41.     Based on information and belief, Mr. White is African-American, possibly 10 years younger than Halouvas and not physically disabled.

42.     In July 2013, before Mayton made the decision on the temporary SI Fac. Mgr. position, McLeod remarked to Halouvas words to the effect of ,"At your age, do you want to put up with the garbage with this crew?" Halouvas confirmed to McLeod that he was interested in the temporary detail.

43. Mayton appointed Halouvas as the temporary Acting Fac. Mgr. for SI, as a GS-12, in July 2013.

44. Prior to beginning his tenure as Acting Fac. Mgr., Halouvas asked McLeod if Halouvas could use the government vehicle he had been assigned in Jamaica Bay, to drive to his temporary worksite in Staten Island.

45. Despite the fact that, under the federal travel policy, use of a government vehicle was presumed to be preferred to an employee's use of his privately owned vehicle, McLeod disallowed Halouvas's request to use his government vehicle, but said that Halouvas could submit an expense report for mileage from the Jamaica Bay park to SI for reimbursement.

46. Through his words and actions, McLeod demonstrated that he had antipathy to Halouvas acting as the Fac. Mgr. for the SI park, because of McLeod's antipathy about Halouvas's age and disability.

47. Around the same time as Mayton appointed Halouvas to the Acting Fac. Mgr. position in SI, Mayton suggested that Halouvas submit an application for the permanent Fac. Mgr. position in SI, which was a higher grade and salary GS-13 position.

*Halouvas's tenure as Acting Facility Manager*

48. Once Halouvas became the Acting Facility Manager ("Fac. Mgr.") in the SI park, Mayton was Halouvas's first-level supervisor who assigned, monitored, and evaluated Halouvas's work. Dept. Sup. McCarthy was Halouvas's second level supervisor.

49. Halouvas's office, and consequently most administrative activities of the SI Maintenance department took place in Building 307 of the Fort Wadsworth section of the

SI park. Mayton's office was in Building 210 of Fort Wadsworth section, and Halouvas visited there on a near-daily basis to update and get instruction from Mayton.

50. A Fac. Mgr. was "responsible for planning, direction and supervisory responsibilities for all activity related to park facilities . . . ". This included responsibility for planning, scheduling, assigning, overseeing and reporting on the annual work program for maintenance and operation of park facilities.

51. As Fac. Mgr., Halouvas supervised between 17 and 40 people, depending on the season. Halouvas' subordinates included 2 supervisors, an administrative assistant and a facilities specialist.

52. Halouvas and his subordinate supervisors were responsible for work done in all three areas of the SI park. This work in different areas of the park required that the subordinate employees frequently work independently, without the constant monitoring of their supervisors. Halouvas and the subordinate supervisors were responsible to ensure that the subordinate workers were able to work independently.

53. Soon after Halouvas became the Acting Fac. Mgr., one of Halouvas's subordinate supervisors, Roland Acevedo ("Acevedo"), indicated that he was having problems with one of his own subordinates, Ramon Dennis ("Dennis").

54. At the time, Acevedo was in the position of B & U Foreman temporarily, as Acting B & U Foreman. Acevedo had little if any prior supervisory experience. (One of the purposes of assigning employees to "act" in a higher graded role was so they could gain experience that would prepare them to apply for associated promotions; the Agency also benefitted because future managers and supervisors got on-the-job training.)

55. Halouvas and Mayton discussed Acevedo's problem regarding Dennis's conduct.

56. Mayton informed Halouvas that Dennis had been insubordinate to his previous supervisors who did not take effective enough action to correct Dennis' behavior. Mayton further explained that Dennis's coworkers often complained that they could not rely on him to do work and questioned why he was not disciplined or fired for his actions, evincing that Dennis created morale problems in the work team.

57. Mayton emphasized that Halouvas had to act as a manager and supervisor of the employees on the team and instructed Halouvas to take a more active role in assisting Acevedo, particularly in the area of supervising subordinates, because Acevedo was a new supervisor and only in an Acting role.

58. Mayton instructed Halouvas that, for the aforementioned reasons, Halouvas had to ensure that regulations and Agency policies were followed so that issues with Dennis did not get out of hand.

59. Under Agency policy, Halouvas's responsibilities as a supervisor included advising employees about performance and conduct expectations, observing employees to ensure compliance with those expectations, and promptly investigating and documenting incidents of employee misconduct.

60. On or around August 22, 2013, Halouvas held a counseling session with Dennis and Acevedo, to discuss Dennis's "Conduct/Behavioral Problems." The specific problems addressed were Dennis's "failure follow directives, discourteous attitude towards his supervisor, disappearance from work sights (sic) and refusal to follow the chain of command."

61.    About a month later, on or around September 23, 2013 Acevedo complained to Halouvas that Dennis again was not following directions. Halouvas held another meeting and instructed Dennis to follow his supervisor's directions.  Dennis adamantly refused until the supervisors contacted Dennis's union representative, shop steward Dennis Murray ("Murray"). Murray convinced Dennis that he had to follow the supervisors' instructions.

62.    At some point, early in Halouvas's tenure as Acting Fac. Mgr., Mayton instructed Halouvas that personnel issues within the SI should be taken to AO McLeod. After the counseling sessions with Acevedo and Dennis failed to result in Dennis changing his behavior, Halouvas would also discuss Dennis's conduct problems with McLeod, whose office was across the hallway from Mayton's.

63.    After only a few weeks, on or around October 5th, Acevedo again informed Halouvas that Dennis was not doing the assigned work, was frequently absent from the assigned work sites for long periods of time, and in other ways ignored Acevedo's directions.  Additionally, Acevedo said he was getting complaints from numerous other workers who did not want to "carry" Dennis.

64.    On October 29th, Halouvas held another counseling session with Acevedo and Dennis in another attempt to address and correct Dennis's continuing Conduct/Behavioral problems, but this counseling session was similarly ineffective.

65.    Although Halouvas discussed these issues with McLeod, McLeod did provide support for Halouvas.  Further, when Halouvas went to see Mayton, he would often see Dennis, who had no work assignments in Building 210, coming out of McLeod's office.  On those occasions, Halouvas found that he often had to defend his actions to McLeod.

66.    On or around November 4th, Acevedo complained in a detailed email to Halouvas, Mayton, AO McLeod and Dept. Sup. McCarthy that, among other things, Dennis had "a tendency to back talk, disregard direct orders, and do whatever he wants with no regards to consequences." Acevedo complained that none of the workers besides shop steward Murray wanted to work with Dennis. Further, Acevedo complained that he had to "micro manage" Dennis's work, which was a "tremendous waste of time" unless Acevedo was working in the same location as Dennis on that day. Finally, Acevedo complained that Dennis was "spending his working hours going directly to upper management for favors to complain about some injustice that he believes has occurred to him." Acevedo included reports and complaints about Dennis that Acevedo had gotten from other workers on the team.

67.    Acevedo's email made clear that Dennis's uncontrolled behavior was interfering with Acevedo's performance of Acevedo's other job responsibilities.

68.    On or around, November 6th, Halouvas and Acevedo held another counseling session with Dennis and Murray to inform them that Dennis' behavior had gotten worse instead of better. During this meeting, Dennis was not only closed to the comments of the supervisors, but in response Dennis spoke loudly and aggressively. Dennis also angrily and repeatedly pointed at Acevedo and Halouvas.

69.    Dennis suffered from some hearing loss and tended to speak louder than others, which both supervisors understood.

70.    However, it was Dennis's angry words and physical actions during the November 6th counseling meeting that intimidated Halouvas. Dennis was at least 10 years

younger than any of the other men in the room. Dennis was also more than a half foot taller, and over 50 pounds heavier than Halouvas or Acevedo.

71. Halouvas was additionally fearful of Dennis's behavior since Halouvas still suffered from the pain and injuries of the plane accident, and was afraid of getting hurt again. These disabilities made him feel especially physically vulnerable to someone who was much taller and heavier.

72. Only adding to the intimidation, Acevedo said that Dennis had been repeatedly telling Acevedo that he had a second occupation as a bouncer at a night club.

73. Despite Halouvas's contemporaneous notifications to McLeod about Halouvas' fear of Dennis's physical aggressiveness and how Dennis's behavior was interfering with Halouvas's, as well as Halouvas's staff's, work performance, McLeod gave Halouvas little if any support.

74. Halouvas complained to Mayton that Mayton's instruction to discuss personnel matters with McLeod was not helping to resolve any of the workplace conflicts because McLeod took no action in support of Halouvas.

75. At some point, Mayton advised that Halouvas bypass McLeod and go straight to the Human Resources ("HR") department for help in dealing with the problems Dennis posed. Halouvas followed the advice by copying the Agency's HR department and/or McLeod's supervisors on important communications after that.

*Mayton rates Halouvas as Superior in 2013, with an Exceptional rating for the supervisory element*

76. In December 2013, after Halouvas had been the Acting Fac. Mgr. for five months, Mayton gave Halouvas a Superior rating for the 2013 fiscal year.

14

77.    Mayton was well aware of Halouvas' work performance given the almost daily conversations they had, and well aware of the efforts that Halouvas had made in response to Halouvas's oversight of Acevedo's supervision of Dennis.  Comprising the overall Superior rating that Mayton gave to Halouvas were superior ratings for 4 of the 5 elements and the highest possible rating -- "Exceptional" -- for the element related to "Supervisory/Managerial duties".

78.    An Exceptional rating for this supervisory element indicated that, among other accomplishments, Halouvas:

"demonstrate[d] excellent leadership skills . . . develop[ed] effective working relationships with others; immediately handle[d] difficult situations with subordinates with professionalism and effectiveness, [] demonstrate[d] foresight in correcting situations that may cause future problems before they arise . . . demonstrate[]d a strong commitment to fair treatment, equal opportunity and the affirmative action objectives of the organization, [] ha[d] a significant positive impact on achievement of goals in this area, . . . [and] provide[d] continuing constructive performance feedback, working with employees to identify ways to improve their strengths."

79.    Mayton made special note that GH held "ongoing meetings to inspire improved performance, proper conduct and ethics [as] a primary goal. Those principles are practiced on a daily basis by [Halouvas who] expect[s] reasonable compliance from his staff."

*Halouvas is selected for the permanent position of Facility Manager for the Staten Island park; Dennis' conduct issues continue*

80.    In early December 2013, Halouvas was recommended by a selection committee for the permanent GS-13 position as Fac. Mgr. for the SI park and Mayton approved the recommendation.  Halouvas held this position until he was forced to resign in June 2015.

81.    Once Halouvas became a permanent Fac. Mgr., Mayton was able to arrange for Halouvas to again have a government vehicle for his exclusive use.

82.    Under standard Agency policy, Agency supervisors used an Employee Performance Appraisal Plan (EPAP) in order to establish expectations for subordinates, provide measurable objectives for evaluation, and issue performance ratings.  In December 2013, Mayton and Halouvas met to discuss Halouvas' EPAP for the future and, like, the recent Superior rating, it indicated that Mayton was more than satisfied with Halouvas' approach to his responsibilities.

83.    Dennis continued to present conduct problems. On or around December 18, 2013 Acevedo informed Dennis that his work hours would need to be changed.  Dennis told Acevedo that he could not change and just walked away.

84.    Two days later, Dennis claimed that he slipped on the ice and brought in a doctor's note stating that he was 100% incapacitated. Dennis took a leave and applied for compensation from the Office of Workers' Compensation Programs (OWCP).

85.    On January 9, 2014, Halouvas learned that Dennis was working another job while he was being compensated by the OWCP.

86.    Halouvas informed Mayton, McLeod, McCarthy and also Olivia Bodner, a HR Specialist, about Dennis's fraudulent activities.

87. When the issue was investigated, Dennis admitted to the United States Park Police ("USPP") that he been working at another job while getting OWCP compensation. According to Agency policy, Dennis should have been required to reimburse the Agency for the fraudulently acquired funds.

88. McLeod said that he was opposed to Dennis having to reimburse the fraudulently obtained funds and, based on information and belief, it is Halouvas's understanding that Dennis was not required to repay the fraudulently acquired funds.

89. On January 17, 2014 when Dennis came back to work, Halouvas reiterated to Dennis that his hours would be changed. The change in work schedule was initiated to provide more accountability for Dennis' work. Dennis said he was not changing his schedule and he refused to discuss it any further.

90. On January 21, 2014 Halouvas held a meeting with Dennis and Murray to discuss the required change in Dennis' work schedule; Dennis's seven or eight year old son was also in attendance at the meeting.

91. During the meeting, Dennis became disruptive and yelled for approximately 10 minutes, during which time neither Halouvas nor Murray could speak. At some point Dennis's behavior became more agitated and Halouvas informed Dennis that if he did not change it, Halouvas would contact the USPP, who were on duty in the park. Dennis walked out but returned within three minutes using confrontational and threatening language, and Dennis repeatedly dared Halouvas to contact the USPP, which Halouvas then did.

92. After this meeting, Halouvas informed Mayton and McLeod that he called the USPP because he felt physically threatened by Dennis' behavior.

93. The following day, January 22nd, Dennis came to work a half hour late.

Instead of beginning work, Dennis told Acevedo he was contacting the Agency's Equal Employment Opportunity ("EEO") office. When Acevedo informed Dennis that he needed permission to contact the EEO office during work hours, Dennis just walked into an empty office and closed the door.

94.    Dennis is African-American and at some point within the time covered by this complaint, filed discrimination claims against both Halouvas and Acevedo.

95.    Mayton told Halouvas that Dennis had filed EEO complaints against all of his previous supervisors at the SI park as well.

96.    Halouvas was confident that he had not discriminated against Dennis and, instead, was holding Dennis to the same standards as the other workers.

97.    After filing the EEO complaint, when Dennis would see Halouvas in the workplace, Dennis began to complain to Acevedo, and perhaps others, that Halouvas was stalking or harassing Dennis.

98.    Halouvas was not stalking or harassing Dennis and was in the workplace, as required by his position.

99.    As Dennis's supervisor, Halouvas was required to provide a statement to an EEO investigator regarding Dennis's EEO complaint. Halouvas was never found to have discriminated against Dennis or any other employee.

100.    On or around February 5, 2014, Halouvas held a counseling session with Mr. Dennis to discuss proper leave procedures and the necessity of turning in a bi-weekly work report, which Dennis had not been doing recently.  Agency procedures required all employees to report the time spent and the projects they worked on; this information was entered into the Agency's Financial Management System ("FMS").

18

101.    On February 10th, when Dennis approached Halouvas in an office hallway, Halouvas asked where Dennis's radio was, because all workers were required to carry their radios with them while on duty.  Dennis first ignored Halouvas but when asked again, Dennis said he had left it in his car. Acevedo later told Halouvas that Dennis's claim about leaving the radio in his car was false, because Acevedo had just seen Dennis pick up his radio from the office.

102.    Later that same morning, during a staff meeting, Halouvas reminded the workers not to leave the radios in their cars.  Immediately Dennis began a tirade in front of the other staff. Dennis repeatedly insulted Halouvas and made vague threats.

103.    Halouvas tried to calm Dennis down. However, it soon became clear that, if anything, Dennis was going to escalate his behavior.  In order to prevent this, Halouvas told Acevedo that Halouvas wanted to speak with Acevedo privately, and the two men left the meeting.  Halouvas was not able to conduct the business of the meeting because of Dennis's disruptive behavior.

104.    Halouvas had also left the room because he felt physically threatened by Dennis and later informed both Mayton and McLeod about the situation.

*Halouvas determined that he needed to pursue progressive disciplinary measures because of Dennis'continuing conduct problems*

105.    Some time around Dennis's outburst during the staff meeting on February 10th Halouvas saw that the numerous counseling sessions with Dennis and union steward Murray had not been effective in ensuring that Dennis complied with the rules and policies of the workplace.  Halouvas was concerned that Dennis was increasingly exhibiting

disruptive, threatening, and unprofessional behavior, and thereby, was interfering, sometimes even preventing Halouvas and others from performing their jobs.

106. Halouvas knew that, based on Agency policies and Mayton's expectations, as the Fac. Mgr. , Halouvas was expected to take actions to correct Dennis' behavior.

107. Halouvas was also concerned that he was not getting the appropriate support from McLeod and further, that the exceptions that McLeod made for Dennis, emboldened Dennis and undermined' Halouvas's authority.

108. In keeping with Mayton's instruction, Halouvas contacted the HR Department and spoke with Olivia Bodner, an HR Specialist, and informed her about Dennis' behavior and conduct issues.

109. Over the course of several weeks, Bodner assisted Halouvas in drafting a Notice of Reprimand for "conduct unbecoming a federal employee", which Halouvas could issue to Dennis. Bodner asked Halouvas questions to check facts and then she checked to ensure that the Notice met with regulations. Bodner indicated to Halouvas that the finalized Notice had been vetted by the Agency's legal department and passed muster.

110. The Notice letter held Dennis accountable for his unprofessional behavior during the counseling meetings that Halouvas held with Dennis and the shop steward on November 6, 2013 and January 21, 2014. The Notice further notified Dennis this his inappropriate language and angry outbursts would no longer be tolerated, and warned that additional misconduct could result in further disciplinary action, including termination.

111. On or around March 7, 2014 Halouvas held a meeting with Acevedo, Dennis and Murray in order to deliver and discuss the Notice of Reprimand. During the meeting

Dennis refused to take the letter, said that he was going forward with his lawsuits and then walked out of the room.

112. When Acevedo left the room to try to convince Dennis to come back to the meeting, Halouvas asked Murray for any ideas on how to deal with Dennis. Murray told Halouvas that he had given up.

113. On or about March 24, 2014 McLeod ordered Halouvas to rescind the March 7th Notice of Reprimand to Dennis.

114. Agency managers empowered and authorized other, younger and non-disabled, supervisors to take progressive disciplinary actions against their subordinates.

115. The Agency's managers undermined Halouvas' supervisory authority because of his age and disability by disallowing him from issuing the Notice of Reprimand to Dennis, despite Dennis' continuous, egregious, aggressive behavior.

116. Soon after Halouvas issued the letter to Dennis rescinding the Notice of Reprimand, Dennis escalated his physically and verbally aggressive and inappropriate behavior.

117. On or about May 15, 2014 Halouvas was giving Dennis work instructions in Halouvas's office. Grace Lentini ("Lentini"), Halouvas's Administrative Support Assistant, was also there. Dennis soon raised his voice, threatened to "say things" about Halouvas to others, and yelled at Halouvas words to the effect of, "you're not my fucking boss," "you can't tell me what to do," "you're following me around and that's harassment and it's none of your fucking business, I'm doing my job." At one point, when Halouvas instructed Dennis to give Lentini a piece of paper, Dennis said words to the effect of, "she's not my fucking boss. I'm not giving her anything."

118.    Soon thereafter, Halouvas reported to Agency managers that he felt physically threatened during this meeting.

119.    On or about June 15, 2014, Halouvas assigned Dennis to paint fire hydrants in the park and told Dennis that when Dennis needed to move between hydrants, he could use a John Deere tractor buggy or radio in to be picked up and transported by another worker.

120.    Dennis then contacted McLeod who, without consulting Halouvas, paid Mr. Dennis $55 dollars to use Mr. Dennis's own vehicle. The $55 payment was ostensibly for 100 miles of travel, for two weeks of work.  Halouvas later pointed out to McLeod that one could not travel that much in six months of doing the maintenance work required.

121.    Halouvas was concerned that McLeod was again making unique exceptions for Dennis which only emboldened Dennis.

122.    Halouvas informed McLeod that Halouvas felt things were getting out of control with Dennis and that Mr. McLeod was undermining Halouvas's authority. Halouvas is aware that McCarthy was informed about this situation.

123.    At some point during the spring of 2014, Acevedo was removed from his temporary assignment as B & U Foreman in order to provide other employees with an opportunity to gain experience in a supervisory role.

124.    When several more inexperienced employees were appointed as Acting B&U Foremen, Mayton reiterated his instruction to Halouvas that these new, interim supervisors would need a lot of supervisory support from Halouvas.

125.    At some point in mid-June, Dennis substantially increased how frequently he behaved inappropriately or aggressively, thereby disrupting the workplace. Where Dennis

22

previously interfered with the work of the Agency only a few times a month, in June and July, he began to flout the rules or cause significant disruption more than weekly.

126.    On or about June 23, 2014, Dennis was informed by the then-Acting B & U Foreman, Miguel Reyes ("Reyes"), to report to Halouvas when Dennis came to work. Approximately 45 minutes later Dennis called Reyes to say he was taking a sick day.

127.     On or about June 24, 2014, Halouvas was explaining work instructions to Dennis in Halouvas's office area, with Lentini present.  Acevedo was also present during some of the remaining events. When Halouvas explained what Lentini's role in the work assignment would be, Dennis began a tirade, shouting that he would not report to "her"; then Dennis grabbed the supplies for the job and walked out, ignoring Halouvas's calls for him to come back.

128.    Halouvas then called the foreman for the job that Halouvas had been assigning to Dennis and told the foreman to instruct Dennis to come back to receive the rest of the instructions.  The foreman said that Dennis refused.

129.    However, approximately an hour and a half later, the foreman entered Halouvas's private office with Dennis. Halouvas started moving towards his office door and Dennis slammed the door, preventing Halouvas from leaving the room.

130.    Dennis then began a tirade, yelling and making hand gestures, which made Halouvas feel threatened. Halouvas asked Dennis to open the door four times before Dennis stopped his tirade and allowed Halouvas to leave the room and go to Lentini's desk.

131.    As soon as Halouvas began to again explain the work, Dennis started yelling that he would not report to Lentini, and further insulted Halouvas.   Murray then walked into the office and asked to speak with Dennis.

132.   Halouvas provided an office where Murray and Dennis met. When Murray came out he told Halouvas that Dennis would follow instructions. Halouvas later informed Murray that Halouvas did not approve of Dennis's behavior.

133.   However, Dennis did not follow instructions.  At approximately 2:15 p.m. that same day, Dennis dropped off the supplies, did not report his progress as he had been instructed to do and disappeared until approximately 4:15 p.m., at which time Dennis showed up to drive the Agency's shuttle van, which was Dennis's temporary assignment. Continuing to disregard Agency rules, Dennis wore a black muscle shirt and green trousers instead of the required NPS uniform.  Halouvas informed McLeod and Bodner about these events.

134.   On or around the morning of June 25th, Halouvas sent Dennis an email informing him that he needed to provide a progress report and account for his time between 2:15 and 4:15 pm on the previous day, so that the information could be entered into the FMS system.

135.   Later that afternoon, Dennis questioned the request for the progress report and stated that he had been in his "first line supervisor['s]" office. Contrary to Dennis' statement, when Halouvas inquired, neither the supervisor nor anyone else in that office said they had seen Dennis there the day before.

136.   Throughout his tenure as Fac. Mgr., Halouvas did not require, instruct or expect Dennis to do anything other than what all other workers were required to do.

137.   Later, on or around the afternoon of June 25th, Dennis walked aggressively into Halouvas's office when Halouvas was not there, and angrily told Lentini that he would no longer make a special stop for her with the shuttle van, which previous drivers of the

shuttle van had always done.  Dennis said that this change was an order from Jeanne McKinney, Property Management Specialist.  McKinney later told Lentini that she had given no such order.

138.   Acevedo had been a witness to Dennis's confrontation with Lentini regarding the shuttle van, and later informed Halouvas that Lentini was truly upset and shaken by the incident.  Lentini also complained to Halouvas in an email about the incident.

139.   Halouvas soon after informed Mayton, McLeod and Bodner *via* email about Dennis' confrontation with Lentini regarding the shuttle van.  Mayton said he wanted to take administrative action but any administrative action would have had to have been initiated or at least agreed to by McLeod, and nothing was done in response to Mayton's suggestion.

140.   Agency managers subjected Halouvas to a hostile work environment because of his age and disability by continuing to ignore Halouvas' mounting reports of Dennis's aggressive and threatening behavior towards Halouvas and his staff, failing to support Halouvas, undermining Halouvas' authority, and preventing Halouvas from taking progressive disciplinary action in response to Dennis' behavior.

141.   On or around June 26th, Halouvas again met with Dennis and Murray to inform Dennis that his aggressive, intimidating and insulting behavior would not be tolerated. During the meeting Dennis continually interrupted, accused Halouvas of protecting Lentini, stated that Ms. McKinney "hate[d Halouvas's] guts", and called Halouvas a liar.  Further, despite Murray's advice, Dennis refused Halouvas's request for written justification of the previous lapse in time.  Dennis stated that he did not need to report to Halouvas, only to his own first line supervisor. Halouvas told Dennis that Halouvas would

now be Dennis' first line supervisor, that Dennis needed to follow his work schedule and report progress daily. Halouvas also warned that failure to follow the schedule or provide proper justification would result in Dennis being held AWOL.

142.   On or around June 27th, Dennis informed Halouvas he would be in late on the following workday so that he could see his doctor. Dennis also told Halouvas that he needed reasonable accommodation. Halouvas reminded Dennis that he was violating proper sick leave procedure, on which he had been counseled numerous times. Halouvas also told Mr. Dennis that he needed to know what disability Dennis needed an accommodation for.

143.   On or around July 1st, in keeping with agency rules, and in response to Dennis' request for reasonable accommodation on or around June 27th, Halouvas provided Dennis with a form required to make a reasonable accommodation request.

144.   On or around July 7th, Halouvas emailed McLeod, Bodner, and McCarthy recommending a 5 day suspension for Dennis because of actions including: taking 125 hours of improper sick leave, the June 25th aggressive behavior toward Lentini, and other acts of discourteous and disorderly conduct.

145.   On or around July 8th, McLeod suggested to Halouvas, *via* email, that they have a meeting with Ms. Bodner to "discuss the way ahead."

146.   On or around July 9th, McLeod emailed Halouvas that Dennis had complained that Halouvas would not allow Dennis to do overtime.  Without asking for any information from Halouvas, McLeod stated that Halouvas's actions were not warranted and requested that Halouvas "address the issue immediately".

147.    Halouvas responded to McLeod's email immediately, and copied McCarthy, Mayton, Bodner and Superintendant of Gatewy, Jennifer Nersesian. In his response, Halouvas explained that he was not aware of any legitimate overtime request by Dennis that Halouvas had disallowed. Further, Halouvas explained in detail how the actions Halouvas had taken were in keeping with the collective bargaining agreement. Halouvas concluded by stating that Halouvas and a subordinate supervisor had been trying to provide overtime for Dennis. However, very recently, when the manager of the unit where the overtime was to be performed discovered that it was Dennis who would be performing the overtime, she cancelled the request, stating that under no circumstances did she want Dennis working there because he was untrustworthy and needed to be followed to ensure what he was doing.

148.    McLeod responded to Halouvas's email, acknowledging that Halouvas's previous actions had been correct and in keeping with the referenced regulation.  McLeod then requested that Halouvas provide all overtime documentation to McLeod's office, possibly hoping to find Halouvas in error.  Halouvas delivered all of the requested documentation to McLeod who did not mention the issue again.

149.    On or around July 19th, Halouvas inspected a work site that was nearing completion. As part of his routine, Halouvas began photographing the completed work and called out several times to see if any of the crew were still in the building.  There was no answer. However, when Halouvas began photographing the work in a second floor bedroom, Dennis stuck his head out of the bathroom and said "I'm trying to take a shit." Halouvas was startled that anyone was in the building and left immediately.

150. Dennis soon reported to Acevedo that Halouvas had done this to harass Dennis.

151. Dennis reported the same complaint to McLeod who called Halouvas in for a discussion about the Dennis's allegations.

152. During Halouvas's discussion with McLeod, Halouvas complained that he felt Dennis's baseless claims were further harassment of Halouvas by Dennis. Halouvas further complained that he felt like, in management's eyes, everything Halouvas did was wrong.

153. McLeod apparently disbelieved Halouvas's version of events, asked for Halouvas's phone and had it examined by IT personnel. Afterwards, McLeod acknowledged that he examination of Halouvas's phone did not substantiate Dennis's claims.

154. Dennis also reported Halouvas's alleged harassing picture-taking to the USPP which began an investigation. On July 27th, the detective conducting the investigation informed Halouvas that the USPP would not pursue the claim, again, because there was no substantiation of Dennis's allegations.

155. On or around July 21st, Halouvas walked into a subordinate supervisor's office to discuss ongoing work. Dennis was there and upon Halouvas' arrival began ranting that Halouvas was harassing Dennis, trying to embarrass him by taking pictures of Dennis while he was "trying to take a dump." The supervisor intervened to try to calm Dennis down, but to no avail. Halouvas left the office to avoid escalating the situation without being able to discuss ongoing work with the subordinate supervisor, which Halouvas had originally come to do.

156. On or around July 24th, Lentini told Halouvas what she had learned from other passengers in the Agency's shuttle van that was driven by Dennis. Dennis drove back

28

and forth between the Agency's SI park and Floyd Bennett Field in the Jamaica Bay park. The passengers told Lentini that Dennis was reckless and allowed others to drive the bus back to the SI park while he slept in the back of the bus.

157.    On or around the following day, Halouvas drove to the Jamaica Bay park in the morning and met with associates there.  Halouvas was there to see Dennis arrive in the shuttle van, drop the passengers off, and then climb into the back of the van while a female passenger climbed into the drivers seat to drive the van back to the SI park. Halouvas then went home.

158.    Later that afternoon, Lentini called Halouvas at home and reported that Dennis had come into the office earlier that day, very agitated. Lentini stated that Dennis bypassed her completely and went directly into Halouvas's private office. Not finding Halouvas there, Dennis came out and asked where Halouvas was. When Lentini said that Halouvas had gone for the day, Dennis stated that he was looking for Halouvas because Halouvas had slashed his tires.

159.    On or around July 28th, Halouvas went to see McLeod, who greeted Halouvas with a smile on his face.  Before Halouvas said anything, McLeod said that Dennis had been in to tell him that Halouvas slashed his tires.

160.    McLeod continued that he had already investigated and learned that Halouvas was at home, 55 miles away, at the time of the incident and therefore could not have slashed Dennis's tires.  Given these findings, McLeod told Halouvas that Halouvas need not worry about being held responsible for the slashed tires.

161.    In response, Halouvas addressed the inappropriate nature of McLeod's perspective.  Halouvas reiterated what he said to McLeod during the previous discussion

and investigation of Dennis' allegation that Halouvas was taking harassing pictures of Dennis. Halouvas stated that with these and other false accusations, Dennis was harassing Halouvas.  Halouvas further complained again that Dennis frequently acted in a physically threatening manner causing Halouvas to feel harassed and anxious about his physical safety. Halouvas emphasized that Halouvas needed McLeod to ensure that the Agency's anti-harassment policy, which prohibited discriminatory harassment, was followed.

162.    Halouvas also informed McLeod about Halouvas's intention to have Dennis removed as the shuttle driver, for everyone's safety, because Halouvas had seen Dennis allow a passenger to drive the shuttle van, just as passengers had reported to Lentini.

163.    McLeod opposed removing Dennis as the shuttle van driver based only on Halouvas's word. When Halouvas suggested that they conduct an inquiry and question the passengers, McLeod refused to conduct an inquiry unless passengers came forth voluntarily.

164.    Halouvas complained that McLeod was again undermining Halouvas's authority, that they had "bull in a china closet" and that continuing to allow Dennis to constantly violate rules without consequence was only going to get someone hurt. Halouvas said that Agency managers were condoning a behavior that could only get worse as Dennis felt more empowered with each action that they ignored.

165.    Also on or around July 28th, McLeod violated protocol by allowing Dennis to take sick leave that day because Dennis was upset that his tires had been slashed. Agency policy mandated that only a supervisor or manager in an employee's chain of command could approve the taking of leave, and McLeod was not in Dennis' chain of command. This

further undermined Halouvas's authority and was evidence that Dennis was again going to upper management to avoid having to follow Agency policies and Halouvas' supervision.

166. Also, on or around July 28th, Dennis requested sick leave to take the following day off. Halouvas said he would not allow it because there was to be an all-hands meeting the next day, which all staff were required to attend.

167. On or around July 29th, Dennis called Acevedo and said he would not be coming in. Halouvas emailed Dennis several times, warning that if he did not attend the meeting he would be counted as AWOL.

168. On or around July 30th, Halouvas spoke with Lt. Brian Waite with the USPP about a number of vandalism reports and learned that Dennis had reported that it was Halouvas who slashed the tires on Dennis's car. Halouvas learned that Dennis had been repeating the same falsehood to anyone who would listen.

169. On or around July 30th, Halouvas learned that McLeod and other Agency managers had decided to give Dennis a smart phone as a reasonable accommodation for his hearing impairment, bypassing Halouvas' request that Dennis complete the required paperwork. Later Halouvas heard that Dennis was boasting that he had received a government smart phone when no one other than managers, not even his immediate supervisor, had one.

*Mayton, as Halouvas's direct supervisor, again rated Halouvas's performance as Superior*

170. By contrast to the other Agency managers' consistent actions to undermine Halouvas' authority, Mayton again rated Halouvas' performance as Superior. In July 2014, Mayton was preparing to retire. Under Agency regulations, because Mayton had been Halouvas's direct supervisor for 10 months of the 2014 fiscal year, Mayton drafted up the

31

performance appraisal and held a meeting with Halouvas to go over it. Jeffrey Kangas ("Kangas"), Chief of Project Management at Gateway, who was to become Halouvas's direct supervisor when Mayton retired, sat in on the meeting.

171.    Mayton had been aware of all of Halouvas's efforts to deal with Dennis's discipline and conduct problems. Mayton was also aware of the pervasive lack of support, even antipathy for Halvouas's supervisory authority from McLeod. At no time during those ten months, nor during the July discussion of Halouvas' performance, did Mayton controvert his previous instructions to Halouvas on the necessity of setting clear boundaries for Dennis. Nor did Mayton ever communicate that he found fault in any way with Halouvas's supervisory actions. During the July discussion, Mayton made it clear that he felt that Halouvas had continued to do as good, or better, job than when Mayton issued Halouvas the Superior rating in December 2013, and said that Halouvas's rating should be better than the one Halouvas received the year before.

172.    At the end of the meeting, Mayton delivered the rating to Kangas which, under agency regulations, could not be issued until the end of the fiscal year.

173.    On or around August 7, 2014, after a meeting, as Halouvas drove out of the park around 3:45 p.m., Halouvas passed Dennis, who was reclining in his own car. Halouvas did not slow down but knew that Dennis should have been working at that time. On or around August 8th, Acevedo told Halouvas that Dennis had called Acevedo at home to complain that Halouvas was checking up on him.

174.    By August 2014 Halouvas had been Fac. Mgr. for approximately a year. During that time, Dennis had become an increasing problem in the workplace because he would not follow Agency policies or his supervisors' directions. Further, Dennis had

escalated his verbally and physically threatening behavior towards Halouvas and Halouvas's staff.  Halouvas's efforts to follow Mayton's instructions about supervising his subordinates had been continuously undermined by McLeod. Further, McLeod and other Agency managers had ignored and failed to take corrective action in response to Halouvas's repeated complaints that Halouvas was being subjected to a hostile work environment. Agency managers also ignored Halouvas's request that they enforce the Agency's Anti-Harassment policy, which prohibited discriminatory harassment.

*Halouvas's August 12, 2014 meeting with Administrative Officer McLeod, Deputy Superintendent McCarthy, and HR Specialist Bodner about Ramon Dennis; Halouvas's supervisory authority is curbed explicitly because Halouvas is a "white supervisor"*

175.    On or around August 12, 2014 Halouvas was called to a meeting with McLeod, McCarthy and, by phone for part of the meeting, Bodner, to discuss the ongoing problems with Dennis.

176.    At the meeting Halouvas recounted his previous complaints to managers about Dennis' repeated and escalating, verbally and physically aggressive tirades against Halouvas and his staff; Dennis's frequent lies and his refusal to follow supervisory instructions; and the fact that other workers on the team did not want to work with him.

177.    Halouvas reminded them of his previous complaints about harassment and a hostile work environment to which Halouvas was subjected because of Dennis's physical and verbal aggressiveness, and reiterated that as Agency managers, they should have taken action to correct the situation as provided by the Agency's Anti-harassment order which prohibits discriminatory harassment.

178. Further, Halouvas reiterated his complaints that Agency managers' had undermined Halouvas's authority and had repeatedly intervened to protect Dennis from having to follow Agency policy or protect him from the consequences of his actions, including when they ordered Halouvas to rescind a disciplinary letter authorized by the HR department, failed to require that Dennis pay back fraudulently obtained OWCP funds, continued to allow Dennis to sleep in the back of the shuttle van while he let unauthorized passengers drive, and take leave without following proper procedure. Halouvas complained that all of these actions only exacerbated Dennis' behavior problems.

179. Halouvas complained that Agency managers' had further emboldened Dennis by providing inordinate benefits such as $55 dollars to use his own vehicle, or overtime that violated Agency procedures; and by not requiring Dennis to follow procedure to take leave, or obtain benefits such as a smart phone without requiring Dennis to complete proper paperwork.

180. During the meeting, Halouvas complained that by ignoring Halouvas's many complaints and, further, by undermining his authority to address Dennis' behavior and conduct issues in keeping with Agency policy, managers had created or, at a minimum had done nothing to prevent or correct the hostile work environment that Halouvas faced every day. Halouvas made clear that he felt harassed, physically threatened, and anxious. Halouvas also stated that the Agency managers were aware of both his physical injuries and the fact that he needed to take pain medication throughout the day that could increase feelings of anxiety, both of which made him feel especially vulnerable. He emphasized his expectation that they enforce the Agency's Anti-harassment policy in order to protect him from the hostile work environment.

34

181.    Agency managers did not contradict Halouvas's complaints or allegations. Instead, they told him that because he was a white supervisor and Dennis was a black employee, they wanted to avoid litigation and they were ordering Halouvas to have no more direct supervisory contact with Dennis.  Instead, they ordered Halouvas to allow the subordinate supervisor, Acevedo to be completely responsible for supervising Dennis.

182.    The Agency managers finished by imposing a uniquely disempowering mandate for a supervisor. McCarthy said, in effect, that Halouvas should not speak to, approach, or even look at Dennis. Further, McCarthy ordered that when Halouvas saw Dennis, Halouvas was to walk in the other direction.

183.    This humiliating edict -- that Halouvas retreat whenever Dennis walked into an area – established a perverse dynamic which would allow Dennis to chase Halouvas from a work site merely by showing up.  It would be hard to create a rule more destructive of a supervisor's authority than this, and it was designed by Agency managers, either purposely or severely negligently,  and it further undermined Halouvas's authority in the workplace and with his staff.

184.    Halouvas was further taken aback and vigorously objected to McCarthy and McLeod's explanation that Halouvas was given these orders because of his race.  Halouvas said that he had never taken race into account and said he was opposed to the idea that it should be an issue that was considered in managing Dennis.  The Agency managers insisted on their reasoning.

185.    If Agency managers had wanted to correct the hostile work environment that Halouvas complained of, they could have assigned another manager to be Acevedo's first-line supervisor.  Instead, they left Halouvas in a position of being responsible for what

happened within the maintenance department or under Acevedo's supervision, while taking away any power or authority that Halavous had to address or correct the serious and potentially dangerous problems created by Dennis.

186.    After having made clear his objection to the mandate and the Agency's managers' reason for it, Halouvas reiterated that he expected Agency managers to ensure that the Agency's Anti-harassment policy would be followed.  However, Halouvas also stated that he understood and would follow the managers' order to stay away from Dennis and that, thereafter, only Acevedo would have direct supervisory authority over Dennis.

187.    After the meeting, Halouvas explained to Acevedo the managers' order, including that they explicitly premised it on the basis of race. Halouvas then followed the instructions of the Agency's managers and refrained from interacting directly with Dennis. Going forward, Halouvas contacted Acevedo regarding any assignment or performance issue related to Dennis.

188.    McCarthy's edict, based on race, shed new light on another personnel issue that had been occurring within the Maintenance department since Halouvas became the Acting Fac. Mgr.  Specifically, in August 2013, one of Halouvas's subordinate supervisors, James Maniscalco ("Maniscalco") reported that his subordinate worker, Rodney Sidney ("Sidney"), nearly assaulted Maniscalco.  Maniscalco was an approximately 65 year old Caucasian supervisor and Sidney was an under 40 year old African-American employee.

189.    Maniscalco filed an incident report with the USPP.  And, at the time of the incident Halouvas collected statements from the parties, submitted them to McLeod, and assumed that McLeod had taken appropriate action on Maniscalco's complaint.

190.     Halouvas heard nothing more about the Maniscalco-Sidney incident until June 2014, when Maniscalco contacted Halouvas; Maniscalco was upset that, in violation of Agency policy, no action had been taken in response to the alleged assault. Halouvas then contacted Bodner to inquire about the processing of Maniscalco's complaint.  Some time later Bodner told Halouvas that "they" thought the issue was too old by that point.  Given the context of Bodner's statement, Halouvas assumed that Bodner was referring to McCarthy and McLeod.

191.     McCarthy's statement, which explicity based her instruction that Halouvas no longer take supervisory action related to Dennis because Halouvas was a "white supervisor" and Dennis was "black", mandated the same Agency inaction in response to an African-American subordinate's physically threatening behavior towards his supervisor, who was white.

*On or around the morning of August 27, 2014 Dennis assaulted Halouvas while Halouvas was sitting in his car*

192.     On or around August 27th, at approximately 10:30 a.m., Halouvas was about to leave the Miller Field area of the SI park after inspecting a work site there. The security gate to exit Miller Field was just wide enough for one car to pass, and just before the gate opened, Halouvas saw another vehicle coming through in the other direction. Halouvas stopped, and as the vehicle came through, Halouvas saw that it was Dennis in his personal vehicle.  Halouvas did not acknowledge Dennis nor make any effort to communicate with Dennis who drove by, to another area of Miller Field that was approximately 390 feet (more than a football field) away from Halouvas's vehicle.

193.  After Dennis drove away, Halouvas called Acevedo to ask where Dennis was supposed to be working, and Acevedo said that Dennis should have been painting the curbs in the Fort Wadsworth area of the SI park, which was 5 miles away from Miller Field.  When Halouvas informed Acevedo of Dennis's location, Acevedo sounded frustrated.

194.  During the short discussion, Halouvas heard several email alerts go off on his cell phone, and decided to review them quickly before he drove the five miles back to the Fort Wadsworth area.  Before Halouvas finished reading the new emails, he saw that Dennis had come back and parked his vehicle in between Halouvas's vehicle and the gate, blocking Halouvas's exit.

195.  Dennis got out of his car and approached Halouvas's vehicle, waving his arms wildly and yelling obscenities.  Halouvas immediately rolled up his window and repeatedly asked Dennis to move away from Halouvas's car.  When Dennis continued yelling and gesticulating, Halouvas lifted his phone and started taking pictures of Dennis' threatening behavior. In the context of Halouvas's managers consistent dismissal of Halouvas's complaints that he feared Dennis's physically aggressive behavior, Halouvas thought he the pictures could provide proof.  Dennis turned to walk away and, relieved, Halouvas put his car into gear, intending to drive away once Dennis moved out of the way.

196.  However, Dennis quickly turned back and yanked Halouvas's car door open. Halouvas had mistakenly believed that his door was locked. With the door open, Dennis pushed Halouvas into the car, out of his seat belt and down onto the seat.  Then Dennis climbed on top of Halouvas trying to reach Halouvas's phone, which initially Halouvas held away from him.

197.    Almost immediately, Halouvas was flat on the seat, face up, and using all of the strength in both of his arms, trying to push Dennis off of him. However, given Halouvas's previous injuries and Dennis's size and weight, Halouvas could not move him at all.  Dennis had his full weight on Halouvas and was trying to keep Halouvas's arms pinned. During this struggle, Halouvas's foot slipped from the brake and the car rolled forward a little, but was basically stationary.

198.    Several times, Dennis grabbed one of Halouvas's arms and slammed it against Halouvas's chest. Not knowing Dennis's intent, Halouvas became extremely frightened because he did not know how much physical damage Dennis could or would do. Halouvas feared that if Dennis began to punch Halouvas, he could cause real damage. Realizing that Dennis's feet were still on the ground, Halouvas moved his foot to the gas and stepped on it slightly, thinking that Dennis might roll out of the car as the vehicle moved further forward. The car moved slightly and slowly forward, and as Dennis rolled out of the car, so did Halouvas's cell phone.  Dennis quickly picked Halouvas's cell phone up from the ground, ran to Dennis's own car and then drove away.

199.    Halouvas was shaken, but once the tremendous fear subsided, Halouvas decided to drive immediately to the USPP to report the assault. Halouvas started driving on Father Capodonno Boulevard towards the USPP station in the Fort Wadsworth section of the SI park. However, Halouvas soon saw that Dennis was driving very slowly ahead of him. There is an impassable divider between the opposite sides of the Boulevard, so Halouvas could not make a U-turn.  There were also few cut-offs from the Boulevard, so Halouvas could not easily pull into a cross-street.  Halouvas did not want to get close to Dennis' vehicle, so Halouvas also drove slowly, keeping far back from Dennis' vehicle.  As soon as

Halouvas saw that Dennis had stopped his car, Halouvas stopped his car as well.  Dennis then got out of his car and threw Halouvas's cell phone towards Halouvas and immediately drove off.

200.    Halouvas got out of his car, walked to the phone and picked it up by a corner, trying not to disturb any of Dennis' fingerprints that would be on it.  Halouvas knew that Dennis lied easily and Halouvas thought fingerprints might help to substantiate Halouvas's report to the police should Dennis fabricate.

201.    Still shaken by the events, Halouvas drove first to Acevedo's office, went in, and asked Acevedo if he would go with Halouvas to the USPP to report the assault.

202.    Acevedo agreed and as the two men got into Halouvas's car, Dennis unexpectedly pulled his vehicle in front of Halouvas's car again, blocking the men from heading towards the USPP.

203.    Acevedo, while still in the car, called to Dennis several times, telling him to let them pass, but Dennis refused.  Acevedo then got out of the car, walked towards Dennis and told Dennis to let them pass. Again Dennis refused. Finally, Acevedo stood in front of Dennis' car and cautiously guided Halouvas's car past so they could drive to the USPP.

204.    However, when Acevedo got back in Halouvas's car, Dennis quickly swung his vehicle around to block the entire street, again preventing Halouvas and Acevedo from proceeding to the USPP station.  Acevedo again tried to convince Dennis to move but he refused. It was only when Acevedo picked up his phone and told Dennis that he was calling USPP, that Dennis drove away. Halouvas and Acevedo then drove straight to USPP to report the assault.  Halouvas also intended to turn the phone over to be dusted for fingerprints in the event he needed to substantiate his account of the assault.

205.    Halouvas and Acevedo entered the station through the rear entrance and informed officers why they were there. An officer escorted them to the main section of the station to get a statement. When they got to the main section of the station, they noticed that Dennis was there. And as soon as Dennis saw Halouvas, Dennis started screaming obscenities and lunged towards Halouvas. Several officers had to restrain Dennis to keep him from physically attacking Halouvas again.

206.    Halouvas and Acevedo were then escorted to the conference room so that they could give their statements.

207.    Halouvas also turned his phone over to the police investigator, confident that the pictures Halouvas had taken of Dennis would demonstrate just how angry and physically aggressive Dennis had been even before he got into Halouvas's car and attacked him.

208.    Later, while still in the conference room, through the open door, Halouvas saw McCarthy and McLeod walk by. McCarthy looked at Halouvas but did not say anything.

209.    Halouvas waited for several hours.  Later that evening, an officer of the USPP told Halouvas that he was being charged and would be taken to the NYC police precinct. Given that the USPP has the authority to deal with any criminal matter, Halouvas did not know why the USPP transferred the case to the New York Police Department ("NYPD") Halouvas knows of no other situation in which the USPP processed a case this way.

210.    Halouvas was handcuffed, and because he felt humiliated, he asked if it was necessary. Halouvas was told that it was, but he was allowed to have his jacket draped over the handcuffs.  Halouvas was taken to the 122nd Precinct of the NYPD in Staten Island, and was put in a room with other men being processed. Halouvas was handcuffed to a railing in

that room for approximately four hours.  During this time, Halouvas saw that Dennis was brought in and put in a cell.  Halouvas recollects that Dennis was not handcuffed. Halouvas was eventually given a summons for a court appearance and was released.

211.    Halouvas was charged with 3rd degree assault and harassment of Dennis, while Dennis was charged with petty larceny for taking Halouvas's cell phone.  Given the aforementioned facts, these charges were improper and could not be sustained. Consequently, the charges were eventually dropped by the District Attorney in the New York Criminal Court. It is reasonable to assume that McLeod and McCarthy's involvement at the USPP may have been at least partially responsible for the false charges leveled against Halouvas.

212.    To whatever extent McLeod and McCarthy provided statements which biased the charging police against Halouvas, the Agency managers were motivated by animus towards some or all of Halouvas's protected characteristics.  This would include a retaliatory animus for the strong opposition that Halouvas expressed to them when they curtailed Halouvas' supervisory authority over Dennis based explicitly on race.

*Halouvas's injuries from the Assault*

213..    The day after the assault, Halouvas knew that he had been seriously injured and asked his new supervisor, Mr. Kangas, to sign an OWCP CA-16 form, which Kangas did. The signed form authorized examination and treatment for the "injury from assault" that Halouvas suffered while on the job.

214.    Halouvas had his arm in a sling for more than a month, was treated by doctors, did physical therapy, and underwent two surgeries but was still permanently injured by Dennis's assault.

215.    Over a year later, OWCP compensated Halouvas for permanent injuries to both shoulders. A final determination of the degree of permanent injury is still to be determined, but the OWCP compensated Halouvas over 50 thousand dollars for the level of permanent injury not in dispute.

216.    As described more fully below, Agency officials interfered with and delayed Halouvas's receipt of the OWCP compensation.

*Halouvas and Dennis are both put on administrative leave*

217.    Also, on or around August 28th, McLeod informed Halouvas that there were no pictures at all on Halouvas' phone and that Dennis had informed the police investigator that Dennis had erased them.  Halouvas then understood why Dennis had driven so slowly on Father Capodonna Boulevard after the assault – Dennis had been deleting all of the pictures Halouvas had taken of Dennis just prior to the attack. Halouvas then understood that Dennis had stopped his car and threw the phone back to Halouvas the day before, only after Dennis was certain that he had destroyed that evidence of Dennis's physical aggressiveness.

218.    Also on or around August 28th, Kangas issued letters to both Halouvas and Dennis, which notified them that, as a result of the August 27th "alleged . . . altercation" and subsequent arrests, they were being "placed on administrative leave pending further investigation".

219.    Halouvas's letter instructed that Halouvas refrain from any contact with Dennis and that Halouvas stay away from the SI park, but stated that "this is not a suspension or penalty . . . [only] a temporary administrative measure for your own safety and the safety of others while we investigate to determine precisely what happened." In the

letter, Kangas promised to contact Halouvas "within one week" to instruct Halouvas when and where he should return to duty.

220.   When Kangas delivered the letter he told Halouvas to leave the park immediately, specifically disallowing Halouvas from returning to his own office to retrieve personal belongings, equipment, or files.

221.   Unbeknownst to Halouvas at the time, it would be nearly six months before the Agency would conduct any investigation, Agency managers would never return Halouvas to his position, and he would only be allowed back into his own office to retrieve his belongings over nine months later, after the Agency forced him to resign.

222.   However, at that time, Halouvas relied on the letter. He assumed that park investigators would, as stated in the letter, investigate to "determine precisely what happened", and that Halouvas would be returned to duty in the near future.

223.   Halouvas was confident that when investigators looked at all of the evidence, including the extent of Halouvas' injuries, Dennis's attempt to assault Halouvas at the police station, Acevedo's statements about Dennis's attempts to block Halouvas and Acevedo from going to the police to report the assault, and the previous series of false allegations that Dennis had been making about Halouvas, it would be clear that Dennis had assaulted Halouvas in the car. Halouvas further assumed that Dennis's admission to the investigator about deleting Halouvas' pictures would be seen as evidence of Dennis' guilt, further supporting Halouvas's account.

224.   Later that same day, Halouvas was contacted by his former supervisor, Richard O'Neill ("O'Neill"). O'Neill told Halouvas that O'Neill had recently been in a meeting with McCarthy in which the assault was discussed. O'Neill said he was contacting Halouvas

to pass along McCarthy's recommendation that Halouvas take a disability retirement because there would be no positive outcome for Halouvas after this incident. O'Neill relayed that it would be to Halouvas's benefit to take the disability retirement.

225.    Halouvas was surprised and taken aback by McCarthy's recommendation because it was made before the Agency had even begun to investigate the incident. Halouvas immediately told O'Neill that he refused and that McCarthy's demand was discriminatory.

226.    Halouvas was also surprised that, in violation of normal Agency policy and practice, O'Neill had been involved in a meeting regarding the incident because O'Neill was no longer in Halouvas's chain of command.

*Going forward*

227.    Halouvas was passionate about, and dedicated to his position at the Agency. He had always made every effort to contribute to the Agency's mission. Further, between July 2013 and July 2014, when Mayton retired, Halouvas had consulted closely and followed all of Mayton's directions regarding the proper approach to address Dennis' serious conduct problems.

228.    Halouvas waited to be contacted by an Agency investigator and looked forward to providing investigators with proof of Dennis' assault.

229.    However, as time went on and the investigation did not start, and Halouvas was still ordered not to come to the SI park or engage in any supervisory activities with the maintenance staff, Halouvas began to feel isolated. He was concerned that his supervisory authority within the team would inevitably erode if Agency managers kept him totally isolated from the team for a long period.

230.   Halouvas also remained disturbed by McCarthy's recommendation that Halouvas take disability retirement, which O'Neill had previously communicated. Halouvas was worried that he had no proof that O'Neill ever conveyed such a message. Halouvas waited until O'Neill returned from a long leave and, on or around September 16, 2014, Halouvas called O'Neill again and asked for clarity.  This time, Halouvas taped the conversation.

231.   O'Neill confirmed that McCarthy had recommended that Halouvas take disability retirement, but pointed out that McCarthy made that suggestion almost immediately after the assault. O'Neill offered that perhaps she had changed her mind once she had time to think and that the results of an investigation might also make a difference. O'Neill offered that, in any event, Halouvas could stand his ground, rely on the fact that Halouvas had done nothing wrong, and resist any pressure to leave his position.

232.   Halouvas contacted the Agency's EEO office on September 24, 2014 alleging that Agency managers had discriminated against him on the basis of age, disability and race.

233.   After more than one month passed and Halouvas had not been contacted by an investigator or returned to duty, Halouvas contacted Supt. Nersesian and asked for a meeting.  Halouvas thought she could take action to ensure that an investigation was conducted quickly and fairly so that he could clear his name and get back to duty. Nersesian refused to allow Halouvas to come to the SI park for the meeting, but agreed to meet with him in a diner on Staten Island.

234.   Soon after, Halouvas, Nersesian and Kangas met at a Staten Island diner. Halouvas's arm was still in a sling and he asked Nersesian why he was being isolated when

he was the one who was injured. Nersesian justified the Agency's failure to investigate and return Halouvas to duty by saying that they had to wait for "the process", wait for the Agency's Solicitor to take action, wait for criminal charges to be dropped. Halouvas informed Kangas and Nersesian that he had filed an EEO case because of discriminatory actions taken by the Agency.

235. In mid-October 2014, Halouvas learned that McLeod had made statements to Halouvas's subordinate supervisor, Maniscalco, blaming Halouvas for the fact that the Agency took no action in response to Maniscalco's August 2013 complaint about being assaulted by his subordinate.

236. Halouvas complained to Kangas that McLeod's false statements, whether purposeful or not, would further cause harm to Halouvas's reputation with his subordinates.

237. Around that same time Maniscalco contacted Nersesian to try to get the Agency to take some action on his complaint about the assault. Nersesian had Kangas conduct an investigation. Kangas reviewed the prior statements, met with the parties and witnesses again, and concluded that there was sufficient evidence to move forward with a disciplinary action. However, McLeod took issue with Kangas' findings and the Agency took no further action. When Halouvas learned about this, Halouvas saw it as another incident reflecting Agency managers' statements that they were opposed to taking actions to support a white supervisor when the supervisor was in a conflict with an African-American worker.

238. While Halouvas was still on administrative leave, on or around October 23, 2014 Halouvas contacted the Agency to ask what he should do about the approximately 91

hours of paid leave he had accrued, which he would lose if he did not use them by the end of the year ("use-or-lose leave"). Normally, an employee would not use accrued leave when they were being paid while on administrative leave.

239. McLeod instructed Halouvas to use the accrued use-or-lose leave. Halouvas did so, but as described more fully below, when Halouvas later became entitled to reimbursement for the use of the 91 hours of accrued leave, McLeod delayed or refused to process the paperwork. As a result Halouvas lost the associated pay in the amount of approximately $4, 200 or more.

240. Also on or around October 23, 2014 Halouvas informed Kangas that Halouvas had learned about other Agency employees who had been allowed to use a government vehicle while on a detail. Halouvas provided the names of those employees to Kangas and told Kangas that McLeod had previously limited Halouvas's reimbursement to mileage incurred during the detail as Acting Fac. Mgr. In 2013.

241. Halouvas emailed Kangas the appropriate government reimbursement request forms for $884.78 to cover the cost of tolls that Halouvas had paid during the detail and asked Kangas for reimbursement or a reason why he was not entitled to it. McLeod and Nersesian were copied on the email.

242. As discussed more fully below, Kangas forwarded the paperwork to McLeod, who took actions to see that Halouvas was never reimbursed for money that Halouvas had paid for tolls, and to which he was entitled.

243. On or around that same date, Agency managers told Halouvas that he was being taken off of administrative leave and put on a 120-detail to an Agency park in Fire Island. Dennis remained on administrative leave for another month.

*The detail in Fire Island was a de facto demotion for Halouvas, issued to Halouvas by Agency managers because of Halouvas' age, race, disability and in retaliation for filing the EEO complaint against Agency managers.*

244.    The involuntary 120-day detail to the Fire Island ("FI") park was an hour and a half drive from the SI park.  It thereby further marginalized Halouvas from his subordinate staff and others in the SI park while the Agency ostensibly prepared to conduct an investigation into the alleged "altercation with" Dennis.

245.    At some point soon after Halouvas filed his EEO case, he agreed to the Agency EEO office's suggestion that he pursue alternative dispute resolution ("ADR") with the Agency, so that the issues could be discussed informally and an early resolution found. Throughout the fall of 2014, the EEO Counselor informed Halouvas several times that Agency managers were contacted but that they were not agreeing to any date for an ADR meeting that was proposed.  Halouvas believed that this was additional evidence of discrimination and retaliation since he knew that Agency managers had engaged in ADR previously, with Dennis and perhaps with others.

246.    After Halouvas filed an EEO case against Agency managers, they took additional actions which negatively affected the terms and conditions of Halouvas's employment. These actions caused Halouvas humiliation, harm to his reputation, and extreme emotional distress.  Eventually, Agency managers left Halouvas with no reasonable option but to resign.

247.    In addition to being detailed to FI, Halouvas remained banished from the park. He was strictly forbidden from coming to the SI park, entering his own office, or retrieving his personal items.

248.    The detail that Agency managers assigned to Halouvas was a *de facto* demotion in terms of his duties and responsibilities.  After serving for over a year as the SI Fac. Mgr., whose performance was twice-rated Superior by his first-level supervisor, Agency managers reassigned him to act as a *subordinate* to the Fac. Mgr. in the FI park.

249.    The Agency appointed a series of men to act as the SI Fac. Mgr. while Halouvas was detailed in FI.  All of these temporary replacements were more than 10 years younger than Halouvas, were not disabled and were without any known prior EEO activity.

250.    In late October, Halouvas contacted Kangas about conducting the EPAP Evaluations of the subordinates whom Halouvas had supervised for over 10 months.  Of necessity, Kangas asked Halouvas to do the written portion of the Evaluations. However Halouvas was not allowed to conduct the in-person discussion of the rating with any of his employees.

251.    Under Agency policy and practice, supervisors who were on detail to another location at rating time were typically enabled to fully conduct the EPAP evaluations, in order to provide continuity of the supervisory relationship.  The EPAP meeting was a way for supervisors to help build confidence in their subordinates and provide information about what would be expected of them in the coming year.

252.    By prohibiting Halouvas from having this important meeting with his subordinates in SI at the end of the appraisal period, Agency managers caused Halouvas embarrassment and humiliation, further severed Halouvas's relationship with his employees and further undermined Halouvas' reputation and authority.

253.    Halouvas followed Kangas' instruction that Halouvas complete the written portion of the EPAPs and told Kangas that he objected to the way the verbal portion of the

EPAPs was being handled because it was highly unusual and departed from Agency policies.

254.    As Administrative Officer, McLeod was responsible for ensuring that each employee received an end of the year evaluation, and typically McLeod stayed on top of Agency supervisors until all EPAPs had been completed.  As a further discriminatory and retaliatory act, McLeod and other Agency managers saw to it that Halouvas was *not* given a 2014 EPAP Evaluation.  Halouvas's 2014 EPAP Evaluation should have been reflected the Superior rating and evaluation that Mayton had issued in July 2014 as well as the enthusiastic reports that Halouvas's FI supervisors had communicated about his work there.

255.    By failing to give Halouvas his fiscal year 2014 EPAP Evaluation, Agency Managers prevented Halouvas from getting the concomitant end of the year performance award which he should have received, and which would have amounted to an approximated $2, 500 bonus.

256.    Halouvas was additionally disturbed by the fact that neither Kangas nor any other Agency manager met with Halouvas to discuss Agency expectations for Halouvas's 2015 fiscal year appraisal period.

257.    Despite Halouvas's requests, Agency managers would not allow Halouvas to come to his office for even 15 minutes to retrieve all of this winter gear, including his winter uniform, which he needed in order to work in FI.  Halouvas was eventually able to arrange for Lentini to bring his winter gear from the office to a location where Halouvas picked it up, which cause Halouvas more humiliation and embarrassment.

51

258.    It was further humiliating, embarrassing and caused harm to Halouvas' reputation that the Acting Fac. Mgrs., as well as other staff at the SI park, were informed that Halouvas was not allowed to enter the park or retrieve any of his items from the office. For nearly six months, the remainder of Halouvas's photographs and other personal effects remained conspicuously in Halouvas's office, which the Acting Fac. Mgrs. were assigned to use as their own office during their tenure.

*Agency managers' treatment of Dennis after the assault and prior to any investigation, caused additional harm to Halouvas*

259.    Agency managers did not publicly state that they thought Halouvas was responsible for the altercation with Dennis. However, through a series of actions related to Dennis after Halouvas contacted the Agency's office to oppose their discriminatory and retaliatory acts, Agency managers indicated they assumed that Halouvas was at fault. This caused substantial and additional harm to Halouvas reputation as well as emotional distress.

260.    While Agency managers took Halouvas off of administrative leave at the end of October 2014, they paid Dennis for administrative leave for approximately a month more.

261.    While Agency managers banished Halouvas entirely from the SI park until he resigned in June 2015[5], Agency managers welcomed Dennis back to the work site in late 2014 with no restrictions on his access to the park.

---

[5] Between August 28, 2014 and early June 2015, Agency managers never allowed Halouvas in SI park except for two meetings in April 2015, discussed below, for which Halouvas seems to have been mistakenly allowed to come in to SI park.

262.    While Agency managers effectively demoted Halouvas by assigning him to act as a subordinate to someone at his grade and level, Agency managers returned Dennis to his same position and same work unit before the end of 2014.

263.    While Agency managers prevented Halouvas from getting any rating for the 2014 fiscal year, they ordered Kangas to give Dennis a Fully Successful rating.

264.    McLeod and other Agency managers also continued to provide extra, unauthorized benefits to Dennis. This included paying Dennis when he went to court to deal with the criminal charges filed against him and paying Dennis for sick days that he took but did not legitimately need.

*Signals that the Agency does not intend to return Halouvas to duty continued to accrue*

265.    In addition to the aforementioned, Halouvas saw other signals that Agency managers did not want to, nor did they intend to, return Halouvas to his position as SI Fac. Mgr., and instead, would continue to try to force him out of the Agency.  Because of the job protections afforded government employees and because Agency managers knew they had no legitimate reason to terminate Halouvas, the only way they could get Halouvas to leave the agency would be to convince him to do so, which they had tried to do by having O'Neill suggest disability retirement around the time of Dennis's assault of Halouvas, or to make Halouvas' work environment so miserable that he would choose to resign.

266.    During several conversations that Halouvas had with Kangas in the fall of 2014 about returning to his position, Kangas intimated that Halouvas would not be returned to his position. For example, when Halouvas told Kangas that he wanted to do the face to face EPAP discussions with his subordinates in SI, Kangas said words to the effect of, "I don't think you'll have to worry about that. Things will probably change."

267.    During the annual meeting and party in December 2014, McCarthy and McLeod came to the table where Halouvas was sitting and they greeted everyone else at the table personally but completely ignored Halouvas.

268.    At this meeting, Halouvas should have been given his 10-year service award but he was not given the award.

269.    Halouvas learned from a colleague, whose second line supervisor was closely acquainted with McCarthy, that McCarthy intended on finding a way to push Halouvas out of the Agency.

*Halouvas hoped that in early 2015 he would be vindicated and restored to his position*

270.    Despite these signals and the mounting emotional distress, at the end of 2014 and beginning of 2015, Halouvas continued to hope that once the criminal charges against him were defeated or dropped, and an Agency administrative investigation completed, he would regain his position in good standing.

271.    Halouvas was bolstered in this hope by the praise he got from supervisors in the FI park. Not only did Halouvas's direct supervisor approve of Halouvas work, but Halouvas' plight was noticed by K. Christopher Soler ("Soler"), the Superintendent of the Fire Island park. As Halouvas' 120-day detail to FI was coming to a close, Soler told Halouvas that he viewed the Agency's treatment of Halouvas as wrong and said he would contact Agency managers to tell them as much.

272.    However, since Agency managers had not made themselves available for ADR counseling on Halouvas's EEO claims, when the Agency told Halouvas that the EEO counseling efforts had been exhausted and he would need to file a written complaint to in order to continue, Halouvas filed a written complaint.

273.     Agency managers soon took actions that indicated that they not only would prevent him from returning to his former position as SI Fac. Mgr., but they wanted him gone from the Agency altogether.

274.     On our around January 29, 2015, all criminal charges against Halouvas were dropped.  The Agency no longer had a legitimate reason to keep Halouvas still detailed to an outpost.  However, Agency managers did *not* bring Halouvas back.

275.     On or around January 30th, Halouvas emailed Nersesian and informed her that all criminal charges had been dropped; that, because of the Agency's retaliatory actions against him, he had suffered physically and mentally when Agency managers violated Agency regulations to take these actions against him. Halouvas requested that he be restored to his former position immediately and provided with a "Hostile free Work Environment".  Halouvas also requested to meet personally with Nersesian but no meeting was ever scheduled.

276.     On or around February 13th, Halouvas learned that Agency managers had deprived him of having any input into the selection of a new Facility Assistant, the employee who would be his direct assistant approximately 10 days later when Halouvas's detail in Fire Island was to end.  Under Agency policy and practice, since Halouvas was ostensibly only on a temporary detail and would return to his position, Halouvas would have been the selecting official for that position selection.

277.     On or around February 19, 2015, Halouvas's original 120-detail to Fire Island was, without justification or explanation extended for another 120 days.  Soler told Halouvas that he had recommended that the SI managers take Halouvas back, but they had evidently not been persuaded.

278.    On or around February 23, 2015 Halouvas contacted Kangas after Halouvas was informed that the Agency would finally begin the administrative investigation into what the Agency termed  the August 27, 2014 "altercation" or  "incident" but which was really Dennis's assault of Halouvas.  Halouvas complained to Kangas that, in the six months since the assault, Halouvas had been left in the dark and treated like an outcast.  Halouvas expressed his concern that the investigation be conducted fairly and that it include investigation of the conduct of individuals and workplace environment leading up to the assault.  This would be a clear indication to Agency managers that during the administrative investigation, Halouvas expected to reveal the hostile work environment to which he had been subjected despite his complaints over many months to McLeod, and the fact this his supervisory authority was consistently undermined and eventually suspended altogether based on his race and the race of Dennis.

279.    On or around February 24, 2015 Halouvas underwent surgery for the injury to his right shoulder caused by Dennis's assault in August 2014.

280.    On or around February 26th, Halouvas was contacted by then Acting Fac. Mgr. in SI who asked that Halouvas remove his personal effects from his SI office.  Kangas supported the request but would not allow Halouvas to come to SI to collect his personal property.  Instead Kangas said the items would be boxed up and mailed to Halouvas.

281.    On or around March 13, 2015, the OWCP accepted Halouvas's claim that he had sustained a "bilateral shoulder impingement and bilateral rotator cuff tear" when attacked by Dennis in August 27, 2014.

282.    On or around March 26, 2015, Halouvas was contacted by Jeffrey Pascale ("Pascale") who said that he was writing the administrative report on the "incident" that

56

occurred in August 2014 and that he wanted to meet with Halouvas to "document [Halouvas's] side of the story."

283.   On or around April 9, 2015, Halouvas was instructed by McLeod to go to the SI park to meet with and be interviewed by Pascale.  Halouvas met with Pascale in Building 210 but was not permitted to visit his office or staff in Building 307, which was at the opposite end of the Fort Wadsworth area of the SI park, about 300 or 400 yards away.

284.   Halouvas provided Pascale with a detailed account of how Dennis had: unexpectedly shown up at Miller Field rather than the work location to which he was assigned; blocked Halouvas's car from leaving Miller Field with Dennis's own car, then attacked Halouvas while Halouvas was seated in his own car, immobilized with a seat belt; blocked Halouvas's car again to prevent Halouvas and Acevedo from proceeding to the USPP to report the assault; and finally, lunged at Halouvas in the police station, when several police officers had to physically restrain Dennis from causing additional injury to Halouvas.  Halouvas provided the investigator with documentation showing that the OWCP had authorized compensation for the injuries to both shoulders that Halouvas received during Dennis's attack and the surgeon's operative reports.

285.   On or around April 15, 2015 Halouvas again went to Building 210 after being instructed by McCarthy to meet a special agent with the Agency's Office of Inspector General there, on an unrelated matter.

286.   However, when the agent was not at the agreed upon location on that date, Halouvas inquired and was told the meeting had been cancelled.  Halouvas then went to Kangas' office and Kangas told Halouvas that McCarthy had chastised Kangas when she found out that Halouvas had been in the park the week before to meet with Pascale.

57

Halouvas informed Kangas that he had come to that meeting the previous week as instructed by McLeod.

287.   Kangas told Halouvas to wait in the conference room while Kangas consulted with McCarthy, who was the one who had instructed Halouvas to meet the investigator at the SI park that day.  Kangas returned shortly and told Halouvas to leave the park immediately and would not allow Halouvas to go to his own office to pick up some additional personal belongings there. Halouvas was humiliated because other employees saw that he was being forced to leave the park again.

288.   Towards the end of April Halouvas started inquiring when he could get a copy of Pascale's report of his administrative investigation of the August 27th assault, but got no response from Agency managers.

289.   On or around April 21, 2015 Halouvas submitted documentation to the investigator assigned to conduct the Agency's investigation of all of Halouvas' EEO claims. This documentation included a statement by Halouvas that McCarthy had engaged in discrimination and retaliation when, he learned recently, that McCarthy indicated to several senior managers her intent to find a way to terminate Halouvas and had asked Kangas if he would be willing to sign the termination papers.  Halouvas charged that "these actions work to make me lose face, embarrass me, undermine my authority, making my position intolerable and impossible to be effective as a Manager. In other words, setting the ground work for Constructive Discharge. (A discriminatory constructive discharge occurs when the employer discriminatorily creates working conditions that are so difficult, unpleasant, or intolerable that a reasonable person in the aggrieved person's position would feel compelled to resign. (sic)".

290.    Soon thereafter, anticipating that McCarthy would continue in her efforts to force Halouvas out, Halouvas started filing applications on USA Jobs so that he could transfer to another federal agency.

291.    Agency managers had justified many deprivations and humiliations of Halouvas on the ostensible need for an administrative investigation into the August 27th "altercation", but then would not allow Halouvas to review the document even after it was completed.  On our around April 29th, Halouvas emailed Kangas that Pascale said the report of the administrative investigation should be finished that week and Halouvas wanted a copy of it as soon as possible.  Kangas said "OK" but did not provide Halouvas with a completed report.

292.    On or around May 4th and May 8th, as Halouvas's second 120-day detail to FI was coming to a close, Halouvas contacted Kangas to inquire about getting new uniforms that had been sent to Halouvas's office in the SI park.  The fact that no Agency manager had informed Halouvas about where he should report for duty at the end of the second 120-day detailed supported Halouvas's feeling that Agency managers did not want him working in SI.  Halouvas does not remember getting any response to this inquiry.

293.    During May 2015, Halouvas continued to contact Pascale to try to get a copy of Pascale's report of the administrative investigation he had completed.  On or around May 26th, Pascale emailed Halouvas and said that Pascale's finished report of the administrative investigation he did would be signed that week and that Pascale should be able to provide a copy of that report after that.

*Halouvas, having been constructively terminated by the Agency, notified the Agency that he would be transferring to another agency*

294.    On or around June 8, 2015 Halouvas notified Kangas that he had taken a job offer to work in another federal agency and was looking for a "release date" of June 27, 2015.

295.    Halouvas had taken another job because the Agency's actions increasingly led Halouvas to reasonably conclude that Agency managers would not return him to his position as SI Fac. Mgr., that they would continue to take actions to embarrass and humiliate him, and that they would escalate these actions in an attempt to force him to resign.  Halouvas was constructively terminated by Agency managers because of his age, disability, race and in retaliation for his protected EEO activity.

296.    Halouvas had been subjected to a hostile work environment for over a year that was increasingly physically threatening, verbally abusive and eventually resulted in serious physical injury, which all caused Halouvas emotional distress.  After Halouvas vigorously opposed Agency managers' curtailment of Halouvas's supervisory authority specifically because of his race, and Halouvas followed that by filing an EEO complaint, Agency managers subjected him to ten months of a constructive demotion, they treated him like an outcast, destroyed his supervisory relationship with his subordinates in SI, and held him in a limbo with no hope that he would be able to clear his name; these retaliatory acts increased Halouvas' emotional distress. For all of these reasons, Halouvas felt that he was constructively terminated and he accepted the first reasonable position he could find, which happened to be at the GS-12 level.  Given that Halouvas was forced to give up his GS-13 position for a GS-12 position, Halouvas estimates that he will lose approximately $70, 000 over the next ten years based on forced demotion.  Further, he will lose approximately $3, 000 in TSP Agency contributions.

297.    On or around that same day Halouvas informed Kangas that Halouvas would need to get into his office to collect information Halouvas had on his computer pertaining to Halouvas's EEO case.  Halouvas also complained that all of his requests for a copy of the report of the administrative investigation into Dennis' August 2014 assault had been effectively ignored.

*During the first six months of 2015, Agency managers took actions and failed to take actions, which resulted in Halouvas being deprived of financial benefits to which he was entitled.*

298.    As indicated above, Halouvas initiated paperwork for reimbursements to which he was entitled.  In retaliation for filing an EEO claim, Agency managers subsequently took or failed to take a number of actions necessary for Halouvas to be reimbursed.

299.    As indicated above, Halouvas submitted paperwork to Kangas in the fall of 2014 for reimbursement of $884.78 in tolls that Halouvas had spent during his 2013 detail as the Acting Fac. Mgr. in SI.

300.    Under Agency policy, Halouvas should have been reimbursed for these tolls.  Halouvas was informed that other Agency employees were either reimbursed for expenses or allowed to use a government vehicle while on a detail, and that McLeod had authorized this.  Upon knowledge and belief, these employees had not engaged in protected EEO activity.

301.    Kangas informed Halouvas that Kangas forwarded the paperwork to McLeod and McLeod was copied on the original email request.

302. In the middle of June, before Halouvas left the Agency, Halouvas against contacted McLeod about these tolls and provided to McLeod all of the necessary documentation.

303. Halouvas was never reimbursed for the $884.78 he spent on the detail.

304. Agency managers' acts and omissions which deprived Halouvas of $884.78, to which he was lawfully entitled, were discriminatory and taken in retaliation for Halouvas's protected EEO activity, of which they were aware.

305. As indicated above, Halouvas used 91 hours of use-or-lose leave at McLeod's direction in the fall of 2014. Once the OWCP, in March 2015, approved Halouvas's claim of on-the-job injury in August 2014, Halouvas should have been reimbursed for the hours that 91 hours of use or lose leave that he used in order to address that injury.

306. Halouvas presented information to McLeod who continually found fault with the form or content of documentation that Halouvas provided to McLeod in seeking the reimbursement.

307. Halouvas contacted the Agency's Payroll Timekeeper in the Agency's Denver office, who confirmed that Halouvas was entitled to the pay. Halouvas then referred McLeod to the Timekeeper to confirm the assessment she provided to Halouvas.

308. Halouvas also contacted Bodner who told McLeod to reimburse Halouvas. Halouvas also fully notified Nersesian about the issue.

309. McLeod never took the appropriate actions and as a result of McLeod's omission, Halouvas was deprived of $4, 240.60 to which he was lawfully entitled.

310.    Agency managers' acts and omissions which deprived Halouvas of $4,240.60 to which he was lawfully entitled, were discriminatory and taken in retaliation for Halouvas's protected EEO activity, of which they were aware.

*On June 15, 2015 Halouvas met McLeod in Halouvas' office to try to retrieve computer files Halouvas needed for his EEO case and other personal effects. McLeod informed Halouvas that the investigative report was being revised because it contained "errors".*

311.    On or around June 11, 2015 Halouvas was instructed to meet McLeod at Halouvas' office on June 15th, so that Halouvas could collect the remainder of his personal effects and take the information pertaining to his EEO case off of Halouvas's computer, which had been in his office since Halouvas had been banished from the SI park in August 2014.

312.    On or around June 15, 2015 Halouvas met McLeod in Halouvas' office with the intent of getting into his own files on his computer to pull information Halouvas had pertaining to his EEO case.

313.    However, McLeod denied Halouvas's request to go through his own files and instructed Halouvas to tell McLeod what documents he wanted; then, McLeod would make copies for Halouvas. McLeod said Halouvas would have two hours to complete this.

314.    Halouvas objected that he should not have to inform McLeod, or have McLeod watching over his shoulder as Halouvas collected evidence for his EEO case.

315.    McLeod said Halouvas had no right to the documents on the government computer and Halouvas would have to have his attorney contact the Agency if Halouvas was not satisfied with McLeod's terms.

316.   Halouvas declined to give McLeod information about the files he wanted for his EEO case and then asked McLeod for a copy of the report of the administrative investigation of the August 2014 assault.

317.   McLeod informed Halouvas that Agency managers had received the report and that there were errors in it, which he would not discuss with Halouvas. McLeod said that the errors were being corrected and a finalized report would be issued after that. McLeod claimed not to know who was correcting the report.

318.   On that same day, Halouvas learned from Pascale that it was McCarthy who had received Pascale's original report and who returned it to Pascale with the "corrections."

319.   After Halouvas learned from Pascale that McCarthy was the one who was given the opportunity to alter and approve the report, Halouvas forwarded the information to Nersesian. Halouvas strongly objected to the fact that an Agency manager named in Halouvas' EEO complaint was given the primary authority of reviewing and changing what was to be an independent administrative hearing report.

*On Halouvas's last day, Agency managers delivered to Halouvas a letter of Proposed Removal, a CD of Halouvas's computer hard drive from which files on McLeod and McCarthy were missing, and a copy of the a biased report of the administrative investigation of the August 27th assault*

320.   On or around June 26, 2015 Halouvas went to return all required Agency items to Kangas in order to be officially released from employment with the Agency. Kangas then gave Halouvas a letter of Proposed Removal that had been signed by Jennifer Nersesian.

321.    Halouvas said he thought the letter was just further retaliatory harassment but Kangas stated that Kangas thought it was issued to make it difficult for Halouvas to get a job with the Agency if Halouvas decided to reapply.

322.    The letter of Proposed Removal is replete with falsehoods and manipulations of fact that hold Halouvas solely responsible for Dennis' assault of Halouvas on August 27, 2014.

323.    In the Agency's Proposed Removal letter, Nersesian held Halouvas accountable for the assault despite the fact that Halouvas had been sitting in his vehicle approximately 5 miles away from where Dennis was assigned to work, when Dennis attacked Halouvas.  In drafting the letter, Nersesian avoided facts that would indicate the threat that Dennis posed before he assaulted Halouvas, the extent of Dennis's assault on Halouvas or the fact that Halouvas took only enough action necessary to end Dennis's assault.

324.    In the letter, Nersesian recounted Dennis' version of the assault by stating, as fact, that Dennis only reached through the window to take Halouvas' phone and then Halouvas dragged Dennis with the automobile.  Nersesian knew this had to be false. Nersesian saw Halouvas when he was still in a sling more than a month after Dennis' assault; Nersesian had also recently seen the OWCP findings and reports of surgery that Halouvas needed on both shoulders due to the injuries Halouvas sustained from the August 27th attack, which could not have happened based on Dennis' version of events.

325.    Additionally, despite having seen all of that evidence, Nersesian's entire account of Halouvas's injuries in the letter of Proposed Removal was stated as "You claimed an injury to your left shoulder but refused treatment".  Further. in Charge 1, Halouvas is

charged with "engag[ing' in a physical altercation with Mr. Ramon Dennis which resulted in injury to Mr. Dennis."  There is no other reference to either employee's injuries in the letter.

326.   Also, in the letter Nersesian faulted Halouvas for "following" Dennis after the assault, but neglected to mention that Halouvas was on the road headed towards the USPP to report the assault.

327.   Nersesian also neglected to mention in the letter that, after assaulting Halouvas while Halouvas was sitting in his own car, Dennis used his vehicle in a reckless manner to prevent Halouvas and Acevedo from proceeding to the USPP so that Halouvas could report the assault.  Nersesian further omitted the fact that Acevedo told the investigator that it took several police to restrain Dennis at the USPP station so that Dennis could not physically attack Halouvas again.

328.   In Charge #2 of the letter, Nersesian similarly misstated the facts to present a false account of what occurred. She stated that Halouvas passed Dennis in his vehicle and implied that Halouvas then double backed and stopped his vehicle in a spot to observe Dennis, when in fact, Halouvas was necessarily stopped at the narrow security gate so that Dennis's could proceed through the gate, Halouvas did not move from that spot, and by the time Halouvas knew that Dennis had returned, Halouvas's vehicle was blocked from exiting Miller Field by Dennis' vehicle

329.   Not surprisingly, the letter of Proposed Removal was silent on signficant facts including the year-long history of Halouvas's complaints to Agency management about Dennis's increasingly physically and verbally aggressive behavior with Halouvas and his staff; silent on Agency managers' efforts to prevent Halouvas from holding Dennis accountable using standard Agency progressive discipline; silent on the known series of

false accusations that Dennis had made against Halouvas to Agency managers, the USPP, and others; and silent on the fact that Halouvas had repeatedly complained to Agency managers that he was being subjected to a hostile work environment by the Agency's failure to address Dennis's continuing and escalating conduct problems, which caused Halouvas to fear for his safety and suffer increasing anxiety while at work.

330.    On Halouvas's last day, Kangas also delivered to Halouvas a CD that ostensibly contained the contents of Halouvas's hard drive from the computer in his office, which Halouvas had not been able to access since before the August 27th assault by Dennis. However, when Halouvas reviewed the CD, he saw that the files he had created pertaining to McCarthy or McLeod were all missing.

331.    Halouvas was in the habit of keeping detailed notes on any significant aspects, meetings, events, or issues that arose on the job.  Halouvas had kept detailed notes of these items related to McLeod, McCarthy, as well as all of the related problems Halouvas had encountered while in the position of SI Fac. Mgr.

332.    The Agency's failure to ever allow Halouvas private access to his computer after Dennis's assault of Halouvas on August 27, 2014 deprived Halouvas of evidence to which he was entitled pertaining to his EEO case.  McLeod and McCarthy are two of the primary management officials named in Halouvas's EEO complaint

333.    Agency managers knew that these files could be very damaging for the Agency, at least in relation to Halouvas' EEO case, and the managers destroyed or failed to protect Halouvas' relevant files, thereby interfering with Halouvas's rights protected by the EEO statutes.

334.    On Halouvas's last day, the Agency also provided him with the finalized administrative investigative report of Dennis' August 27th assault. The report is biased against Halouvas for reasons including, but not limited to the fact that it fails to mention that Dennis tried to assault Halouvas again inside the USPP station; the report was silent on Halouvas's injuries despite the fact that the investigator had documentation from the OWCP and Halouvas's surgeon about the extent of permanent damage to both of Halouvas' shoulders; and the report states that Dennis ostensibly went to the hospital after the "altercation" and Halouvas confronted Dennis in the parking lot of the hospital despite the fact that Halouvas denied this and the timeline of events would negate this possibility. *Agency managers continued to take retaliatory actions against Halouvas after Halouvas left NPS and transferred to another federal agency.*

335.    Halouvas was concerned about Kangas' statement that the letter of Proposed Removal could prevent Halouvas from getting selected for another position with the Agency in the future.  Halouvas believed that there would be a number of Agency vacancy announcements in the future, and Halouvas was intent on reapplying for a position with the Agency once Halouvas' EEO case was finished.

336.    For this reason, Halouvas wanted to provide a thorough response to the letter, pointing out the falsehoods and inconsistencies.  The letter provided an address where the recipient could request an extension, which Halouvas' understands is a request that is typically approved.  Therefore Halouvas sent a letter to the address provided seeking an extension.

337.    However, Agency officials effectively hampered Halouvas's intent to provide a thorough response by failing to respond to Halouvas's request for a two week extension

to respond to the letter for Proposed Removal.  Halouvas sought help from Kangas who also sent an email inquiring about where Halouvas could submit his request.  Kangas told Halouvas he never received a response.

338.    When the Agency did not explicitly grant an extension for Halouvas to respond to the letter of Proposed Removal, Halouvas submitted his reply within the initial allotted time frame, without the benefit of extra time to respond as thoroughly as possible.

339.    Agency managers further retaliated against Halouvas several months after Halouvas left the Agency by providing false information to his new employer, the Smithsonian. The falacious information was serious enough that it necessitated that the new employer initiate an investigation of the allegations.  The Agency managers who were involved, forwarded this false information in order to further harass, humiliate and destroy the reputation of Halouvas at his new place of employment.  The investigation was baseless and, when completed resulted in no findings of wrongdoing on Halouvas's part.

340.    The Agency further retaliated against Halouvas after he left the Agency when McLeod continued to withhold information from the OWCP that was necessary for Halouvas to be reimbursed for 444 hours of leave buy back to which he was entitled because of the OWCP's decision in relation to the injuries Halouvas sustained during the August 27, 2014 assault by Dennis.

341.    Because of the Agency's retaliatory failure to complete paperwork in relation to the 444 hours of leave buy back, the Agency deprived Halouvas of $20, 160.40 to which he was entitled.

342.    Agency managers further retaliated against Halouvas by preventing him from being on the best qualified list when he applied in 2016 for his previous position, as SI Fac.

Mgr. at the NPS in response to vacancy announcement NSHRO-MP-KA-1790798-16-18.  On or around January 20, 2017, Halouvas learned that he was not selected for his former position at the agency. Halouvas should have at least been interviewed for the position because he is a disabled veteran, and under Agency policy, he would have been eligible for veterans preference.  In addition, it is not credible that Halouvas would not make the best qualified list after he received two Superior ratings from his first-level supervisor for the work he did in the very position that was the subject of the selection procedure at issue.

343.    Halouvas's previous first-level superivisor, Kangas informed Halouvas that when the agency delivered to Halouvas the letter of Proposed Removal on Halouvas' last day of employment with the Agency, it could have been for the purpose or effect of preventing Halouvas from being considered for selection should Halouvas subsequently apply for a job with the Agency.

Defendant's liability

344.    Defendant Zinke, by and through the actions of McLeod, McCarthy, Nersesian and other of Defendant's agents at NPS, discriminated against, harassed, subjected Halouvas to a hostile work environment because of his age, disabilities, and race, then retaliated against Halouvas when he opposed discrimination.

345.    Halouvas repeatedly informed Agency managers of the increasing severe and pervasive verbal abuse and physically aggressive behavior of employee Dennis, which significantly interfered with Halouvas's ability to do his work for a period of approximately one year.

346.    Despite Halouvas's clear notifications that Agency managers needed to enforce the Agency's Anti-harassment policy, which prohibited discriminatory treatment, Agency managers took no effective corrective action.

347.    Agency further interfered with Halouvas's ability to do his job by repeatedly undermining Halouvas' authority to take appropriate supervisory action against Dennis, whose behavior consistently violated Agency policies.

348.    Agency managers did not similarly limit the supervisory authority of younger, non-disabled supervisors, who were permitted to and supported in exercising progressive discipline against subordinates who would not follow Agency rules.

349.    Agency managers created and maintained a dangerous work environment for Halouvas, because of Halouvas's status as a "white supervisor", by leaving Dennis within Halouvas's supervisory chain of command, yet completely truncating Halouvas' supervisory authority over Dennis, and then imposing on Halouvas a duty to retreat whenever Dennis approached.

350.    Agency managers similarly failed to investigate and take corrective action when another older, white supervisor was threatened with assault by a younger, African-American subordinate.

351.    The dangerous and hostile work environment created by Defendant's agents resulted in Halouvas being physically attacked by Dennis, injured to such an extent that Halouvas needed surgeries on both shoulders, yet he remains permanently physically disabled from the assault.

352.    Agency managers retaliated against Halouvas after Halouvas opposed Agency managers' discriminatory action of curtailing Halouvas' supervisory authority specifically because of Halouvas's race.

353.    Agency managers discriminated against Halouvas and retaliated against him by constructively demoting him, banishing him entirely from the workplace without cause, depriving him of financial benefits to which he was entitled by virtue of his position, and taking other actions to embarrass, humiliate and destroy Halouvas's reputation at work in order to create a work environment that was so hostile that Halouvas reasonably concluded that his only option was to resign.

354.    Agency managers created, maintained and developed this hostile work environment with the intent of forcing Halouvas to retire, based on his age, disability, race and in retaliation for his protected activity.

355.    Agency managers further harassed Halouvas by basing the administrative investigative report of the August 27, 2014 assault by Dennis and the letter of Proposed Removal issued to Halouvas on his last day of employment with the Agency, on egregious omissions of fact and known falsehoods.

356.    Agency managers further harassed and retaliated against Halouvas by publishing known falsehoods to Halouvas's new employer that were so severe that Halouvas's  new employer was required to conduct an investigation into the allegations.

357.    Agency managers further retaliated against Halouvas by ensuring that his application for the position of SI Fac. Mgr. would not be considered during the selection process for vacancy announcement NSHRO-MP-KA-1790798-16-18.

358.    Halouvas was caused to suffer humiliation, embarrassment, fear of harm, intimidation, abusive treatment, constant disregard of his complaints and concerns resulting in severe emotional distress and significant and ongoing emotional injuries and damages because of the illegal actions and conduct described above.

359.    Halouvas was caused to suffer loss of back pay, front pay, future earnings, and all related benefits.

360.    Defendant is liable for the aforementioned conduct, acts and omissions of his agents.

## COUNT ONE
### VIOLATION OF TITLE VII
### DISPARATE TREATMENT BASED ON RACE

361.    Halouvas realleges and incorporates by reference paragraphs 1 – 360 with the same force and effect as if fully set forth herein.

362.    Halouvas is Caucasian and by virtue of his race is a member of a protected class.

363     The acts, omissions, policies and practices of Defendant, by and through his agents violate Title VII of the Civil Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e *et. seq.* because Defendant's agents treated Halouvas differently specifically because of his race and subjected him to materially adverse actions, including constructive termination with no legitimate purpose.

## COUNT TWO
### VIOLATION OF TITLE VII
### HARASSMENT AND HOSTILE WORK ENVIRONMENT BASED ON RACE

364.    Halouvas realleges and incorporates by reference paragraphs 1 – 363 with the same force and effect as if fully set forth herein.

365. The acts, omissions, policies and practices of Defendant, by and through his agents violate Title VII of the Civil Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e *et. seq.* because Defendant's agents subjected Halouvas harassment, because of Halouvas's race, that was severe or pervasive, that was physically threatening, humiliating and unreasonably interfered with Halouvas's work performance

366. Despite Halouvas's many complaints to Defendant's managers, the employer failed to exercise reasonable care resulting in emotional, physical, and mental injury to Halouvas as well as financial loss, loss of reputation and humiliation.

367. Defendant constructively terminated Halouvas when Defendant, by and through his agents, created and maintained a hostile work environment that was so severe or pervasive that a reasonable person in Halouvas's position would have found the working conditions intolerable, and Halouvas resigned his position because he found the conditions created by Defendant, because of Halouvas's race intolerable.

## COUNT THREE
### VIOLATION OF TITLE VII
### RETALIATION FOR PROTECTED ACTIVITY

368. Halouvas realleges and incorporates by reference paragraphs 1 - 367 with the same force and effect as if fully set forth herein.

369. The acts, omissions, policies and practices of Defendant, by and through his agents violate Title VII of the Civil Title VII of the Civil Rights Act, as amended, 42 U.S.C. § 2000e *et. seq.* because Defendant's agents retaliated and took adverse actions against Halouvas when he opposed Defendant's curtailment of his supervisory authority explicitly because of his race and filed an EEO complaint based on Defendant's other discriminatory acts towards Halouvas based on his race.

## COUNT FOUR
### VIOLATION OF REHABILITATION ACT
### DISPARATE TREATMENT BASED ON DISABILITY

370.    Halouvas realleges and incorporates by reference paragraphs 1 - 369 with the same force and effect as if fully set forth herein.

371.    Halouvas has physical disabilities related to his spine and leg which substantially limit his participation in major life activities and interfere with various systems in Halouvas' body, and by virtue of these disabilities he is a member of a protected class.

372.    The acts, omissions, policies and practices of Defendant, by and through his agents violate the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et. seq. because Defendant's agents treated Halouvas differently specifically because of his disabilities and subjected him to materially adverse actions, including constructive termination with no legitimate purpose.

## COUNT FIVE
### VIOLATION OF REHABILITATION ACT
### HARASSMENT AND HOSTILE WORK ENVIRONMENT BASED ON DISABILITY

373.    Halouvas realleges and incorporates by reference paragraphs 1 – 372 with the same force and effect as if fully set forth herein.

374.    The acts, omissions, policies and practices of Defendant, by and through his agents violate the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et. seq., because Defendant's agents subjected Halouvas harassment, because of Halouvas's disabilities, that was severe or pervasive, that was physically threatening, humiliating and unreasonably interfered with Halouvas's work performance.

375.    Despite Halouvas's many complaints to Defendant's managers, the employer failed to exercise reasonable care resulting in emotional, physical, and mental injury to Halouvas as well as financial loss, loss of reputation and humiliation.

376.    Defendant constructively terminated Halouvas when Defendant, by and through his agents, created and maintained a hostile work environment that was so severe or pervasive that a reasonable person in Halouvas's position would have found the working conditions intolerable, and Halouvas resigned his position because he found the conditions created by Defendant, because of Halouvas's disabilities, intolerable.

## COUNT SIX
### VIOLATION OF REHABILITATION ACT
### RETALIATION FOR PROTECTED ACTIVITY

377.    Halouvas realleges and incorporates by reference paragraphs 1 - 376 with the same force and effect as if fully set forth herein.

378.    The acts, omissions, policies and practices of Defendant, by and through his agents violate Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 et. seq., because Defendant's agents retaliated and took adverse actions against Halouvas when he filed an EEO complaint because of Defendant's discrimination against Halouvas based on Halouvas' disabilities.

## COUNT SEVEN
### VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT
### DISPARATE TREATMENT BASED ON AGE

379.    Halouvas realleges and incorporates by reference paragraphs 1 - 378 with the same force and effect as if fully set forth herein.

380.    Halouvas is over 40 years old and by virtue of his age is a member of a protected class.

383.    The acts, omissions, policies and practices of Defendant, by and through his agents violate the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621-634a because Defendant's agents treated Halouvas differently specifically because of his age and subjected him to materially adverse actions, including constructive termination with no legitimate purpose.

**COUNT EIGHT**
**VIOLATION OF AGE DISCRIMINATION IN EMPLOYMENT ACT**
**HARASSMENT AND HOSTILE WORK ENVIRONMENT BASED ON AGE**

382.    Halouvas realleges and incorporates by reference paragraphs 1 - 381 with the same force and effect as if fully set forth herein.

383.    The acts, omissions, policies and practices of Defendant, by and through his agents violate the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621-634a because Defendant's agents subjected Halouvas to harassment, because of Halouvas's age, that was severe or pervasive, that was physically threatening, humiliating and unreasonably interfered with Halouvas's work performance.

384.    Despite Halouvas's many complaints to Defendant's managers, the employer failed to exercise reasonable care resulting in emotional, physical, and mental injury to Halouvas as well as financial loss, loss of reputation and humiliation.

386.    Defendant constructively terminated Halouvas when Defendant, by and through his agents, created and maintained a hostile work environment that was so severe or pervasive that a reasonable person in Halouvas's position would have found the working conditions intolerable, and Halouvas resigned his position because he found the conditions created by Defendant, because of Halouvas's disabilities, intolerable.

**COUNT NINE**
**VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

77

**RETALIATION FOR PROTECTED ACTIVITY**

387.    Halouvas realleges and incorporates by reference paragraphs 1 - 386 with the same force and effect as if fully set forth herein.

388.    The acts, omissions, policies and practices of Defendant, by and through his agents violate the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621-634a because Defendant's agents retaliated and took advers actions against Halouvas when he filed an EEO complaint because of Defendant's discrimination against Halouvas based on Halouvas' age.

WHEREFORE, Plaintiff respectfully requests a judgment against the Defendant:

A.      Declaring that Defendant engaged in unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et. seq.*, the Rehabilitation Act of 1973, as amended 29 U.S.C. § 701 *et. seq.*, and the Age Discrimination in Civil Rights Act, as amended ¶29 U.S.C. §§ 621-634a in that Defendant discriminated against, harassed, and retaliated against Plaintiff for objecting to, and complaining about, Defendant's harassment and discrimination;

B.      Granting a permanent injunction enjoining Defendants and its agents from engaging in further discriminatory treatment on the basis or age, disability or race and retaliation based on protected activity.

C.      Ordering Defendant to reinstate Plaintiff to the position he was in when he was constructively terminated in June 2015.

D.      Awarding damages to Plaintiff for all lost wages, back pay, front pay and benefits resulting from Defendant's unlawful discrimination, harassment, and retaliation

and to otherwise make him whole for any losses suffered as a result of such unlawful employment practices;

C.    Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering, and for injury to his reputation in an amount to be proven;

D.  Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

E.    Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy Defendants' unlawful employment practices.

## **JURY TRIAL DEMANDED**

The Plaintiff requests a jury trial on all questions of fact raised by this Complaint


DATED:    New York, New York
          March 19, 2018


                              By:    **Felicia Nestor, Esq.**


                              **/s/Felicia Nestor, Esq.**

                              *Attorney for Plaintiff*
                              11 Broadway, Ste. 615
                              New York, New York 10004
                              (646) 647-9840
                              fn@fnestorlaw.com